FILED
IN CLERK'S OFFICE
US DISTRICT COURT E.D.N.Y.

★ FEB 16 2017 ★

LONG ISLAND OFFICE

**EASTERN DISTRICT COURT, NEW YORK**
**UNITED STATES DISTRICT COURT**

-----------------------------------------------------------------------

**AIDEN KILLORAN, (Christian Killoran, as parent)**

      **Plaintiffs,**

        **v.**

**WESTHAMPTON BEACH SCHOOL DISTRICT,**
**MICHAEL RADDAY – SUPERINTENDENT,**
**SUZANNE M. MENSCH, HALSEY C. STEVENS,**
**STACY RUBIO, CLAIRE BEAN, JAMES N. HULME,**
**JOYCE DONNESSON, GEORGE R. KAST, JR.,**
**(Individually and Collectively as Board of**
**Education Members),**

      **Defendants.**

-----------------------------------------------------------------------

Index:

**CV 17 0866**

Verified Complaint

FEUERSTEIN, J.
LINDSAY, M.J.

**Relevant Chronology**

1. On 12/18/15, the plaintiff filed a Federal action against the defendant District.

**(See P-1: Original Federal Complaint).**

2. On, 05/09/16, the Federal Court dismissed such complaint without prejudice and granted the plaintiff discretion to re-file if necessary. **(See P-2: Court Decision).** Notably, the Federal Court's decision was predicated upon the plaintiff's failure to preliminarily "exhaust administrative remedies", prior to seeking relief from the Federal Court.

3. In order to comply with the Federal Court's decision, the plaintiff filed a due process complaint against the defendant District.

4. Despite the Federal Court's ruling directing "exhaustion" at the local level, the defendant District filed a motion to dismiss, therein resulting in the dismissal of the complaint. Specifically, the assigned Independent Hearing Officer's (IHO's) decision was predicated upon a jurisdictional rationale, holding that the plaintiff was not a resident of the defendant District, and therefore that the appropriate due process complaint should alternatively be filed against the plaintiff's District of residence.

5. In order to comply with the IHO's decision, the plaintiff filed a due process complaint against the plaintiff's resident District - Remsenburg-Speonk Union Free School District (RSUFSD). Additionally, the plaintiff simultaneously appealed the IHO's decision, arguing that the IHO erroneously dismissed the due process complaint against the defendant District.

6. On 07/11/15, the appellate State Review Officer (SRO) sustained the plaintiff's appeal, therein reinstating the due process complaint filed against the defendant District. **(See P-3: SRO Decision).**

7. In accord with the foregoing, both due process complaints – the complaint filed against the plaintiff's District of residence - RSUFSD, as well as the complaint filed

against the defendant District, were consolidated for adjudication before the assigned IHO.

8. On, 10/14/16, a due process hearing was commenced. Notably, despite the plaintiff's request for adjudication, as well as the Federal Court's directive for local "exhaustion", the defendant District prohibited the assigned IHO from deliberating upon any of the plaintiff's alleged 504 Claims.

9. On, 11/14/16, the due process hearing was concluded.

10. On 12/20/16 post-hearing briefs were submitted **(See P-4: Post-Hearing Brief).**

11. On, 01/26/17, the assigned IHO tendered a decision on the merits. Notably, within such decision, the IHO set forth a number of relevant findings and awarded the plaintiff certain relief. Specifically, the IHO determined that the defendant District violated the plaintiff's free and appropriate educational rights (FAPE) for both the 2015-2016 academic year, as well as the 2016-2017 year. Tangentially, the IHO also mandated that the defendant District hire an "inclusion consultant" for purposes of examining whether the plaintiff's individualized educational plan (IEP) was theoretically capable of being implemented within the defendant District. Inexplicably however, the IHO denied the plaintiff's claims for compensatory damages. **(See P-5: IHO Hearing Decision).**

12. In consequence of the foregoing, the plaintiff filed an appeal, limited to the denial of compensatory damages and seeking to modify the mandated "inclusion consultant's" scope of analytical purview. **(See P-6: Hearing Appeal).**

### Basis of Federal Complaint

13. The plaintiff incorporates by reference, the originally filed Federal complaint against the defendant District, and therein re-asserts all of the claims and allegations set forth therein against each of the defendants named herein.

14. With respect to the concept of "exhaustion", the plaintiff respectfully requests the Court to take measure of the fact that plaintiff's claims relative to the concept of "enrollment" have been fully adjudicated by the assigned IHO. Accordingly, only such claims related to the concept of "enrollment" are set forth herein. Notably, the plaintiff's potential claims related to "educational placement" are still maturing at the local level, and may in fact, depending upon the outcome of such matters, be appropriate for subsequent joinder herein.

### Supplementary Pleadings Related to Section 504 of the Rehabilitation Act:

15. As a foundational premise, the defendants denied the ability of the assigned IHO to adjudicate upon the plaintiff's Section 504 of the Rehabilitation Act ("504")

claims. As such, the plaintiff was deprived of its ability to fulfill this Court's "exhaustion requirement", as evidenced within its prior ruling. Accordingly, counsel herein respectfully submits that such requirement has been "de facto" fully satisfied and therefore now requests adjudication of the merits related to its 504 claim.

16. Specifically, the plaintiff alleges that the defendants have crafted an exclusionary policy wherein no "alternately assessed" special education students are internally educated at the post-elementary level. Indeed, to date, the defendant District has seemingly **never** internally educated an "alternately assessed" special education child throughout any post-elementary grade. Shockingly, the hearing testimony revealed that the defendant District's policy actually goes beyond discrimination of "alternately assessed" students, but actually extends to any child who is not on track to obtain a regents diploma. Indeed, to date, the defendant District does not internally educate **even a single student,** who is not on track to obtain a regents diploma, within the post-elementary level.  Deplorably, all such children continue to be outsourced to foreign districts. Clearly, the defendants have individually and collectively endeavored to deprive the plaintiff of a "free and appropriate education", and certainly have endeavored to deprive the plaintiff of a "comparable education", as compared to the education afforded to "typical", children.

17. Perversely, despite a comprehensive mandate compelling enrollment, the defendants strategically chose to bar the plaintiff access to the very gateway from which all of his subsequent due process rights would emanate. Specifically, the

defendants chose to disavow not only a contractual mandate compelling enrollment, but also a regulatory and common law mandate as well. Indeed, the defendants strategically chose to disregard their obligations, as well as the plaintiff's well-being, in order to insulate itself from liability and preserve its shameful culture of institutional laziness and bigotry. Worse yet, the defendant's actions were undertaken with the simultaneous goal of weakening the plaintiff's fortitude.

18. The defendant's decision to deny the plaintiff's enrollment rights represents a willful disregard of the comprehensive legal framework compelling enrollment. Again, the defendant's actions represent not only a breach of the existing educational law contract, but also a breach of state regulation and the common-law course of historic dealing between the plaintiff's District of residence and the defendant District. Indeed, the defendant's actions reflect a policy of "deliberate indifference" relative to the plaintiff's well-being, as well as volitional disregard of its ethical, professional and fiduciary duties owed to the plaintiff.

19. Specifically, the vesting <u>educational law contract</u> states in pertinent part: … *"and the said party of the second part (defendant District) hereby agrees that in consideration of the payment of such sums as hereinbefore provided, all children covered under this contract shall be admitted into the public school in the school district of the party of the second part (defendant District) and be taught therein during the term of such contract; and such children shall be entitled to, and shall receive like and equal instruction to that imparted to the children of like ages, grades*

*and departments and shall be accorded all the rights and privileges enjoyed by the resident children of the school district of the party of the second part in attendance at the school therein.*" **(See P-7: Educational Law Contract)**.

20. In addition,  Special Education Part 200.2 (f) regulation states: "*Where a board of education provides for the education of all of its students, or of all of its students of any particular grade, by contracting with another board of education pursuant to section 2040 or 2045 of the Educational Law, the committee on special education of the receiving school district (defendant District) shall serve as the committee on special education for all students so placed in such receiving school district*".

21. Also, the defendant's refusal to enroll the plaintiff also defied the common law historic course of dealing between the defendant's District of residence and the defendant District, as the plaintiff remains the **only** student ever to have his/her "school enrollment" choice, superseded by the discretion of a the defendant District, Superintendent and/or Board of Education. Again, the fact that the plaintiff has Down Syndrome remains his only distinguishing feature, and furthermore remains the only basis to which his enrollment rights were denied.

22. Accordingly, by volitionally denying the plaintiff's enrollment rights, the defendants violated not only the existing educational law contract, but also state regulation and the historic common-law course of dealing established between the plaintiff's District of residence and the defendant District. In doing so, the

defendant's denied the plaintiff access to the very "gateway" from which all of his subsequent due process rights would emanate. Furthermore, by all accounts, the only justification for denying the plaintiff's enrollment was the fact that he was born with Down Syndrome.

23. The assigned IHO determined the above referenced violations to be both procedural and substantive in nature, and as such, were found to have directly caused an "educational deprivation" suffered by the plaintiff. Indeed, the plaintiff wholeheartedly agrees with the IHO's assessment in this regard, but furthermore opines that such violations were inflicted in a prejudicial and discriminatory manner and in express violation of his rights protected by Section 504 of the Rehabilitation Act.

24. In consequence of the foregoing, the plaintiff was torn asunder from his educational womb, segregated and ostracized from his family, friends and community, and caused to suffer not only an "educational deprivation", but also significant emotional, psychological and physical harm.

**Supplementary Pleadings Related to 42 USC Section 1983:**

25. The plaintiff re-asserts the foregoing paragraphs contained within this complaint.

26. With respect to the issue of enrollment, the IHO determined that the defendants breached the plaintiff's rights by not enrolling him for both the 2015-2016 academic year, as well as the 2016-2017 academic year. Tangentially, the IHO determined that such violations were both procedural and substantive in nature. Indeed, the plaintiff wholeheartedly agrees and furthermore contends that such violations were inflicted in a prejudicial and discriminatory manner, and furthermore in express violation of the plaintiff's rights as protected by protected by 42 USC 1983 ("1983").

27. Particularly, the defendants, "under color of state law" deprived the plaintiff of equal protection, his rights to a free and appropriate education, and access to "gateway" due process rights. Furthermore, the defendant's actions were undertaken in "bad faith", in clear violation of not only the existing educational law contract, but also state regulation and federal law. Indeed, the defendant's lack any "extraordinary circumstance" justifying their deplorable actions, and furthermore conducted themselves with "callous indifference" of the plaintiff's federally protected rights.

28. In consequence of the defendant's discriminatory policy, the plaintiff was torn asunder from his educational womb, segregated and ostracized from his family, friends and community, and caused to suffer not only an "educational deprivation", but also significant emotional, psychological and physical harm.

**Supplementary Pleadings With Respect to the Americans with Disabilities Act**:

29. The plaintiff re-asserts the paragraphs set forth in this complaint.

30. With respect to the issue of enrollment, the IHO determined that the defendants breached the plaintiff's rights by not enrolling him for both the 2015-2016 academic year, as well as the 2016-2017 academic year. Tangentially, the IHO determined that such violations were both procedural and substantive in nature, therein resulting in an "educational deprivation". Indeed, the plaintiff wholeheartedly agrees with the IHO, but furthermore contends that such violations were inflicted in a prejudicial and discriminatory manner, therein evidencing a violation of the plaintiff's rights as protected by protected by the Americans with Disabilities Act ("ADA").

31. In particular, the ADA was drafted, inter-alia, in order to ensure people with disabilities "access" to education.  Notably, the defendants actions represent a direct assault on this concept, as the defendants acted to deny the plaintiff "access" to his "gateway" due process rights. Indeed, by discriminatorily denying the plaintiff's enrollment rights, the plaintiff was denied "access" to all of his subsequent due process rights emanating therefrom. Indeed, the defendant's endeavored to block the plaintiff's "foundational" educational "access" rights.

32. Indeed, in consequence of the foregoing, the plaintiff was torn asunder from his educational womb, segregated and ostracized from his family, friends and

community, and caused to suffer not only an "educational deprivation", but also significant emotional, psychological and physical harm.

**Supplementary Pleadings With Respect to the Individuals with Disabilities Education Act (IDEA):**

33. The plaintiff re-asserts the paragraphs set forth in this complaint.

34. As illustrated, with respect to the plaintiff's "enrollment" rights, the assigned IHO has fully exhausted such claims and determined that the defendant's refusal to enroll the plaintiff represented breaches of FAPE. Consequently, in this regard, the plaintiff's allegations related to "enrollment" have been fully exhausted. Indeed, only the plaintiff's issues related to "educational placement" remain within the current ambit of pending local adjudication. Consequently, with respect to the defendant's FAPE violations attendant to "enrollment", these matters have been fully "exhausted".

35. Accordingly, as the plaintiff is currently seeking only monetary damages for the "exhausted" violations of IDEA, the plaintiff's stated actions are now appropriate and "ripe" for this Court's review. Indeed, the defendants should be held liable for their egregious breaches of failing to provide the plaintiff with FAPE.

36. In consequence of the defendant's FAPE violations, the plaintiff was denied access to proverbial "gateway" due process. Such violations were inflicted as a

matter of strategic policy and resulted in the plaintiff being torn asunder from his educational womb, segregated and ostracized from his family, friends and community, therein causing not only an "educational deprivation", but also significant emotional, psychological and physical harm.

**Supplementary Pleadings Relevant to Comprehensive Bad Faith**

37. Throughout the plaintiff's ordeal, the defendants have employed despicable "bad faith" tactics. Indeed, such "bad faith" has been comprehensively employed since prior to the commencement of the plaintiff's originally filed Federal action. Specifically, such acts of "bad faith" include, but are not limited to, the following instances.

38. First, prior to the plaintiff's graduation from his District of residence, the defendants refused to meet with the plaintiff regarding his pending eligibility for enrollment.

39. Second, upon graduating from elementary school, despite a clear and comprehensive mandate compelling enrollment, the defendants refused to enroll the plaintiff and convene a Committee on Special Education (CSE).

40. Third, despite numerous attempts for engagement, the defendant District refused to attend the "CSE resolution" conference held by the plaintiff's District of

residence. Perversely, after such resolution conference resulted in an educational placement recommendation within the defendant District, the defendant District only then subsequently argued to the assigned IHO that the defendant District was effectively denied "due process" within such processes. In accord with the foregoing, the defendant District moved to dismiss the due process complaint essentially mandated by this Court's prior ruling.

41. Fourth, upon initially receiving a dismissal order of the due process complaint, the defendant District then subsequently argued against a motion to implead the defendant District as an essential "necessary party". Perversely, after an appointed New York State Review Officer (SRO) sustained the plaintiff's appeal and reinstated the due process complaint against the defendant District, the defendant District then made application to join the defendant District's of residence as a "necessary party", in direct contravention of the logic it formerly employed in its attempt to avoid adjudication of the merits of the plaintiff's claims.

42. Fifth, despite this Court's instructions to allow the merits of the plaintiff's claims to be "administratively exhausted", the defendant District affirmatively deprived the assigned IHO from adjudicating upon the plaintiff's alleged 504 claims.

43. Sixth, upon realizing its malfeasance and culpability within the context of the due process hearing, the defendant District agreed to temporarily enroll the plaintiff only to subsequently convene a "sham" and illegally constituted CSE, empowered to

do nothing other than deliver a pre-determined, disingenuous and inappropriate "Individualized Educational Plan" (IEP).

44. Seventh, upon completion of the due process hearing and in direct contravention of this Court's initial decision, the defendant District subsequently filed a Supreme Court action seeking to dismiss the entire due process complaint. Notably, the defendant District withheld the filing of this action until the completion of the due process hearing.

45. All of the foregoing "bad faith" tactics have been administered with the illicit intent of delaying the legal process and victimizing the fortitude of a fourteen-year old boy blessed with Down Syndrome. Tangentially, the foregoing "bad faith tactics" are illustrated herein, so as to lend further credence to the plaintiff's previously cited arguments relating to "futility". Indeed, the defendant District is committed to preserving its culture of discrimination and it will not end its legacy of bigotry until a Federal Court compels it to do so. Finally, the foregoing "bad faith" tactics are illustrated to support the plaintiff's claims for punitive damages.

**WHEREFORE**, the plaintiff respectfully requests judgment(s) sustaining the recited causes of action against all named defendants and the commensurate issuance of just compensatory ($300,000.00) and punitive ($5,504,714.10) damages (inclusive of all costs, disbursements, expenses and fees).

x. _____

Christian Killoran, on behalf of Aiden Killoran, plaintiff

132 Main Street, 2nd Floor, Suite 132-13

Westhampton Beach, NY 11978

(631) 878-8757

Date: 2/10/17

**Verified Complaint Addendum**

**I. Jury Trial Requested: Yes**

**II. Parties to Complaint**

    A.  Plaintiff:
        Name: Christian Killoran, on behalf of Aiden Killoran
        Street Address: 2 Old Pond Lane, PO Box 1030
        City and County: Remsenburg, Suffolk
        State and Zip Code: New York, 11960
        Telephone Number: (631) 664-5363
        Email Address: cdklaw@optonline.net

    B.  Defendant:
        Name: Westhampton Beach School District
        Title: School District
        Street Address: 340 Mill Road
        City and County: Westhampton Beach, Suffolk
        State and Zip Code: New York, 11978
        Telephone Number: (631) 288-3809
        Email Address: mradday@whbschools.org

    C.  Defendant:
        Name: Michael Radday
        Title: Superintendent, Westhampton Beach School District
        Street Address: 340 Mill Road
        City and County: Westhampton Beach, Suffolk
        State and Zip Code: New York, 11978
        Telephone Number: (631) 288-3809
        Email Address: mradday@whbschools.org

    D.  Defendant:
        Name: Suzanne Mensch
        Title: Westhampton Beach Board of Education, President
        Street Address: 340 Mill Road
        City and County: Westhampton Beach, NY 11978
        State and Zip Code: New York, 11978
        Telephone Number: (631) 288-3809
        Email Address: smensch@whbschools.org

    E.  Defendant:
        a.  Name: Halsey Stevens
        b.  Title: Westhampton Beach Board of Education, Board Member
        c.  Street Address: 340 Mill Road

      d.  City and County: Westhampton Beach, NY
      e.  State and Zip Code: New York, 11978
      f.  Telephone Number: (631) 288-3809
      g.  Email Address: hstevens@whbschools.org

F.  Defendant:
      a.  Name: Stacy Rubio
      b.  Title: Westhampton Beach Board of Education, Board Member
      c.  Street Address: 340 Mill Road
      d.  City and County: Westhampton Beach, Suffolk
      e.  State and Zip Code: Westhampton Beach, 11978
      f.  Telephone Number: (631) 288-3809
      g.  Email Address: srubio@whbschools.org

G.  Defendant:
      a.  Name: Claire Bean
      b.  Title: Westhampton Beach Board of Education, Board Member
      c.  Street Address: 340 Mill Road
      d.  City and County: Westhampton Beach, Suffolk
      e.  State and Zip Code: New York, 11960
      f.  Telephone Number: (631) 288-3809
      g.  Email Address: cbean@whbschools.org

H.  Defendant:
      a.  Name: James Hulme
      b.  Title: Westhampton Beach Board of Education, Board Member
      c.  Street Address: 340 Mill Road
      d.  City and County: Westhampton Beach, Suffolk
      e.  State and Zip Code: New York, 11978
      f.  Telephone Number: (631) 288-3809
      g.  Email Address: jhulme@whbschools.org

I.  Defendant:
      a.  Name: Joyce Donneson
      b.  Title: Westhampton Beach Board of Education, Board Member
      c.  Street Address: 340 Mill Road
      d.  City and County: Westhampton Beach, Suffolk
      e.  State and Zip Code: New York, 11978
      f.  Telephone Number: (631) 288-3809
      g.  Email Address: jdonneson@whbschools.org

J.  Defendant:
      a.  Name: George Kast
      b.  Title: Westhampton Beach Board of Education, Board Member
      c.  Street Address: 340 Mill Road
      d.  City and County: Westhampton Beach, Suffolk

    e.  State and Zip Code: New York, 11978
    f.  Telephone Number: (631) 288-3809
    g.  Email Address: jdonneson@whbschools.org

**III. Basis for Jurisdiction:** Federal Question

    A.  Enumerated Basis:
        a.  Section 504 of the Rehabilitation Act
        b.  42 USC 1983
        c.  Americans with Disabilities Act (ADA)
        d.  Exhausted Claims Under Individuals with Disabilities Education Act (IDEA)

**IV. Statement of Claims:** The defendants, intentionally and with bad faith, individually and collectively, discriminated against the plaintiff, by denying the plaintiff his constitutionally endowed equal protection rights - specifically his rights to a free and appropriate education, as well as access to all appropriate due process attendant thereto. The defendants denied the plaintiff's comprehensively established rights to school enrollment, for both the 2015-2016 academic year, as well as the 2016-2017 academic year. While the issue of ultimate educational placement is currently still pending local administrative review, the issue of the plaintiff's rights relative to "enrollment" have been fully exhausted. In addition, the defendants denied adjudication of the plaintiff's "504" claims at the local administrative level.

**V. Relief:** The plaintiff claims compensatory damages in the amount of $300,000.00 and punitive damages in the amount of $5,504,714.10, plus all applicable costs, disbursements, expenses and fees. Such "compensatory" amounts are due to the plaintiff for injuries suffered and legal costs expended. Such "punitive" damages are due to the plaintiff, due to the defendant's intentional, willful, malicious, and/or grossly negligent acts of discriminating against the plaintiff, relative to denying him his constitutional rights. Relative to the "IDEA" cause of action, the defendant District has already been determined to violate the plaintiff's FAPE rights at the local administrative level.

**VI. Certification and Closing:** Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11. I agree to provide the Clerk's office with any changes to my address where case-related papers may be served. I understand

that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

**Date:** 2/10/17

x. _____

Christian Killoran, as parent, and on behalf of Aiden Killoran, Plaintiff

# P-1: ORIGINAL FEDERAL COMPLAINT

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
C.K. AND T.K., on behalf of A.K.,

                                  Plaintiffs,

                -against-

BOARD OF EDUCATION OF THE WESTHAMPTON
BEACH SCHOOL DISTRICT,

                                 Defendants
-----------------------------------------------------------------X

**VERIFIED
AMENDED COMPLAINT
CASE NO.: 15-cv-4743
(ADS)(SIL)**

Plaintiffs, C.K. and T.K., individually[1], and on behalf of their son, A.K., through their attorneys, Mayerson & Associates, as and for their Verified Amended Complaint allege and state the following:

## THE PARTIES

1.     Plaintiff A.K., the son of Plaintiffs C.K. and T.K., is a minor child who has been classified in his IEP as a child with an intellectual disability by his district of residence, Remsenburg/Speonk School District ("Remsenburg").

2.     At all times relevant to this action, A.K. was and still is a student residing within the Remsenburg/Speonk School District and is entitled to all of the rights, entitlements and procedural safeguards mandated by applicable law and statutes including, but not limited to, the Individuals with Disabilities Education Improvement Act ("IDEA"), 20 U.S.C. §1400 *et seq.*, the pertinent implementation regulations promulgated under the code of Federal Regulations §300.342, *et seq.*, Article 89 of the New York State Education Law, and Part 200, *et seq.*, of the Commissioner of Education's Regulations.

---

[1] Plaintiffs C.K. and T.K. were not named individually in the initial Complaint (filed by plaintiffs' predecessor counsel). However, they are now named both individually and on behalf of their minor son, A.K.

3.      The Westhampton Beach Union Free School District ("Westhampton"), upon information and belief, is a "receiving" school district for Remsenburg that, for many years, has had a systematic plan and policy to violate the IDEA, the Americans with Disabilities Act ("ADA") and the related civil rights of students with special needs by depriving the most severely disabled students from ever entering its doors.  Westhampton also has deprived the students who *are allowed* to attend its schools from the opportunity to be educated with more severely disabled students.   In the IDEA's "Findings," Congress found that:

> Disability is a <u>natural part of the human experience</u> and in no way diminishes the right of individuals to participate in or contribute to society. Improving educational results for children with disabilities is an essential element of our national policy of ensuring equality of opportunity, full participation, independent living, and economic self-sufficiency for individuals with disabilities.

29 U.S. Code § 701 (a)(3).

4.      As alleged above, defendant Westhampton is a "receiving" school district for Remsenburg students once they reach 7th grade (Remsenburg's elementary school ends at grade 6 and it sends its students to two receiving districts from grades 7-12).  <u>However, the evidence will show that as an established pattern and practice, Westhampton, has not, and *will not*, admit or accept any students, who, like A.K., are more seriously impaired and require "alternate assessments."</u>  Westhampton thus follows a discriminatory policy and practice that, plaintiffs submit, is designed to segregate, corral, and divert all of the alternate assessment students from Westhampton, Remsenberg, and other "sending" school districts.

5.      A.K. was born on September 7, 2002, is now thirteen-years-old, and has a medical diagnosis of Down Syndrome.

6.      A.K. and his parents, C.K. and T.K., though known to the District, are not expressly named herein by their given names, or further identified by their actual addresses within the Eastern District of New York, because of statutory ad customary privacy guarantees.[2]

7.      Westhampton is a duly constituted "local educational agency" and school district organized under the laws of the State of New York.  Both procedurally and substantively, Westhampton is an agency charged with the obligation to provide A.K. with a free and appropriate public education ("FAPE") in accordance with IDEA mandates and the New York State Commissioner's Regulations, Part 200.  As a school district (and receiving school district for Remsenburg) that accepts federal funds, Westhampton is also is obligated not to discriminate against A.K. based upon his disability.

8.      Remsenburg is not named as a defendant because Remsenburg does not engage in a discriminatory policy and practice to exclude alternately assessed students, and upon information and belief, supports a plan for A.K. to be educated in Westhampton.

## JURISDICTION AND VENUE

9.      This Court, pursuant to 20 U.S.C. §1415(i)(2)(A), 28 U.S.C. §1331 and 28 U.S.C. §1367 has jurisdiction over this action without regards to the amount in controversy.  This Court also has subject matter jurisdiction in this action by reason of, inter alia, plaintiffs' (federal) civil rights claims brought under the ADA, 42 U.S.C. §§ 12132 *et seq.*, Section 504 of the Rehabilitation Act, and §1983 of Title 42.

10.     Venue is proper in that plaintiffs and defendant all reside in or are situated within this judicial district.

---

[2] Upon the request of the Court, and on an *in camera* basis, plaintiffs are prepared to disclose their given names and addresses.

## ALLEGATIONS COMMON TO ALL CLAIMS

11.    The Remsenburg/Speonk School District is an elementary school district ending at grade six. Children finishing sixth grade at Remsenburg have a choice between the Eastport/South Manor and Westhampton Beach school districts, which act as the receiving schools for Remsenburg students beginning in seventh grade and continuing through the end of high school.  Each child (unless they are "alternately assessed") is given a right to choose their receiving district.  The vast majority who reside within A.K.'s neighborhood choose to attend Westhampton Beach due to its geographic location and closer proximity.  A.K.'s younger, *typically* developing siblings eventually will attend Westhampton once they reach the 7th grade, and that is where the overwhelming majority of A.K.'s peers and friends now attend.

12.    Upon information and belief, Westhampton continues to serve at the "chair" of IEP meetings for alternately assessed students (both from Westhampton and from sending districts), even after these students are *denied* attendance at Westhampton's post-elementary school programs and are forced to attend other schools.

13.    Remsenberg continues to be the financially responsible district for A.K.

14.    A.K. attended elementary school through grade 6 in the Remsenburg schools. During the 2013-2014 (5th grade) and 2014-2015 (6th grade) school years, A.K. attended an Integrated Co-Teaching ("ICT") class at Remsenburg.  ICT classes are unique in that two teachers, a general education teacher and a special education teacher, teach both typically developing students and students with special needs in the same class.  A.K. was one of the special needs students with an IEP.  His IEP also included various

supports and services, including Speech and Language Therapy, Occupational Therapy, Physical Therapy, and a 1:1 aide.

15.     Due to his disability, A.K. *requires* "alternate assessments," meaning that he is not assessed in the same manner that typically developing, and less impaired special needs students would be assessed.  A.K. does not take the same State and district-wide standardized assessment that are administered to general education students, and less impaired special needs students; A.K. requires the use of alternate performance indicators to appropriately assess his abilities and needs.

16.     Although obviously cognitively impaired, A.K. nevertheless is a very social and friendly child who enjoys attending school with his typically developing and special needs peers.   He is a gentle child who loves music and physical activity, and independently ambulates.

17.     Due to A.K.'s progress and growth over the years, Remsenburg transitioned A.K. out of a self-contained special education class (a class with only special needs children and a special education teacher) into its *less* restrictive ICT class in the 2013-2014 school year. A.K. progressed in the ICT classes he has attended and has benefitted and learned while being educated with his non-disabled peers.

18.     A.K. is not a child with serious behavioral issues.   In fact, none of A.K.'s Individualized Education Programs ("IEP") recommend Behavior Intervention Plans for A.K.  A.K. did receive some academic instruction outside of his ICT class – a common accommodation for many impaired students (not just students with Down Syndrome).

19.     A.K. is, by all accounts, a child who is beloved by his school and local community.  A.K. is lovingly referred to as "the mayor" – everyone knows A.K. Due to

A.K.'s history of meaningful and appropriate educational inclusion, and his parents' steadfast commitment to ensuring that A.K. be included and integrated into their community, A.K. has thrived socially with both typically developing and disabled peers. He has made friends, attends birthday parties, and is involved in multiple community events and groups, such as little league, with students from his ICT classes and others. Educational and social inclusion is thus integral and essential to A.K.'s success both now, as a young teenager, and as he enters adulthood, with an aim toward greater independence and self-sufficiency. A.K. will one day enter the work force and continue to live in his home community. Maintaining and facilitating his existing ties to home community is thus essential to A.K.'s success into adulthood.

20.    The overwhelming majority of A.K.'s typically developing and special needs peers went on to attend 7th grade in Westhampton for the 2015-2016 school year. However, due to Westhampton's policy, practice, and outright refusal to allow A.K. to attend due to his "alternate assessment" status, A.K. is tragically languishing in a 6th grade ICT class in Remsenburg – essentially being "held back" educationally and socially due to Westhampton's discriminatory acts.

21.    A.K. is very much aware of the fact that he has not "moved up" to Westhampton with all of his friends, most whom he has known since kindergarten.

22.    Upon information and belief, none of A.K.'s aforementioned peers were rejected by Westhampton (unless they are alternately assessed students like A.K.).

23.    The fact of A.K.'s "alternate assessment" status is the *only* reason that he is not attending the 7th grade in Westhampton with his friends and peers. This is because over

6

the years (decades), the Westhampton Beach School District has steadfastly refused to accept *any* "alternate assessment" children.

24.     Westhampton's policy and practice not to admit A.K., or *any* alternate assessment students, solely on the basis of being "alternately assessed," and segregating these students into other schools, it also violates A.K.'s rights under the IDEA to receive a FAPE in his Least Restrictive Environment ("LRE"), and violates A.K.'s right not to be discriminated against based upon his disability under the ADA, Section 504, and Section 1983. .

25.     Not only does Westhampton refuse to accept any alternate assessment students from its "sending" school districts such as Remsenburg, <u>but it also ships out **all** of its own severely impaired, alternately assessed children who reside in Westhampton Beach to out-of-district placements</u> once they exit elementary school, in total disregard for the mandate of IDEA to educate children in their LRE.  Essentially, Westhampton refuses to educate *any* special education students who cannot take typical standardized assessments. This "designer" policy and practice is impermissibly discriminatory.

26.     Plaintiffs submit that Westhampton is attempting to hide behind its discriminatory policy to refuse to accept any alternately assessed, more seriously impaired students, by claiming that it simply does not have any "appropriate" programs specifically designed for alternately assessed students like A.K., and that they should therefore attend other schools to receive "appropriate" services.  School districts are required to offer the "full continuum."  Westhampton does not offer programming for alternately assessed students because it simply does not want to educate those students.  Westhampton does not want alternately assessed students, so it has never created programs for such students, and they

then always refer such students to other school districts, ostensibly as a "separate but equal" alternative. This type of blatant disability-based discrimination is the very discrimination that the IDEA, the ADA, Section 1983, and Section 504 were enacted to prohibit.

27.    Upon information and belief, the majority of the surrounding school districts, many of which are much smaller and have less resources than Westhampton, educate their more seriously impaired, alternately assessed students *within* their school districts, through grade 12, abiding by their state and federal obligations to educate all of their students with disabilities within their LRE.

28.    Remsenburg is a much smaller school district than Westhampton, yet Remsenburg educates its alternately assessed special needs students "within district" to the greatest extent possible.  Remsenburg was able to provide A.K. with a FAPE in his LRE within district without any difficulty.

29.    Upon information and belief, Westhampton has refused to educate more seriously impaired, alternately assessed special needs students for decades.

30.    Upon information and belief, Westhampton has never educated a student with Down Syndrome, post-elementary school.

31.    The disability rights movement and the civil rights movements are very connected in our nation, including the jurisprudence.    There are clear parallels between Westhampton's policy to segregate and divert more seriously disabled students who are alternately assessed, such as A.K., a student with Down Syndrome, with educational policies from our nation's past that segregated many of our nation's school districts by the color of a student's skin.  Separate was not deemed to be equal at the time *Brown v.*

*Board of Education* was decided, and separate is still not equal today. 347 U.S. 483 (1954).

32.     When A.K. entered the Remsenburg school district (in the 2007-2008 school year) as a pre-schooler, his parents were informed even that that, unlike the overwhelming majority of the Remsenburg student population, A.K. would not be "allowed" to eventually attend the Westhampton Beach school district once he reached 7th grade.  It has never been a secret that Westhampton discriminates against more seriously impaired, alternately assessed students.  It is surprising that Westhampton has managed to evade accountability for this discrimination all these years.

33.     A.K.'s parents reached out to Westhampton administrators and the Westhampton Board of Education during the 2013-2014 and 2014-2015 school years in an attempt to get a jump start on planning for A.K. to attend Westhampton starting in the 2015-2016 school years.  However, Westhampton refused to engage A.K.'s parents in any substantive communication regarding planning for A.K.'s possible entrance into Westhampton. Westhampton would not even consider such an option.

34.     When it came time to plan for A.K.'s transition out of Remsenburg for the 2015-2016 school year, A.K.'s parents attended multiple IEP meetings with representatives from Remsenburg and Westhampton Beach.  At these meetings, A.K.'s parents made it clear that A.K. should be allowed to attend Westhampton Beach along with the rest of his non-disabled peers and the majority of his disabled peers.  Westhampton admitted that A.K. could not attend Westhampton Beach *because* he continued to be recommended for alternate assessment.

35.    Upon information and belief, Remsenburg cannot force Westhampton to accept A.K. Once it was crystal clear that Westhampton was refusing to allow A.K. to attend Westhampton, Remsenburg recommended that A.K. attend Eastport.    In fact, in the Due Process Settlement (Ex. A) Remsenburg makes clear that it supports A.K.'s attendance at Westhampton. However, Remsenburg's request was of course denied.

36.    Remsenberg has offered to meet with Westhampton to create an appropriate IEP program for A.K. to be implemented in A.K.'s least restrictive environment at Westhampton Beach school district.  Westhampton has rebuffed that request.

37.    Plaintiffs are not asking Westhampton to create a "new" class or program at Westhampton.  Rather, plaintiffs are simply asking Westhampton to cease discriminating against A.K., and meet with A.K.'s parents, and representatives from Remsenburg to create an IEP for A.K. to attend an inclusive program at Westhampton with appropriate supports and services.

38.    Westhampton's policy and practice, refusing to admit any severely disabled, alternately assessed students such as A.K., is a systemic discriminatory practice that cannot be adjoined, sanctioned, adjudicated, or otherwise legally addressed by an Impartial Hearing Officer by way of a Due Process action. A.K.'s parents are thus not required to "exhaust" their administrative remedies under the IDEA where it would be a futile and inadequate act to pursue due process procedures, an agency has adopted a policy or pursued a practice of general applicability that is contrary to the law, or, where, as here, it is improbable that adequate relief can be obtained by pursuing administrative remedies (e.g., the impartial hearing officer lacks the authority to grant the relief sought). *See Smith v. Robinson,* 468 U.S. 992, 1014 (1984), *Honig v. Doe*, 484 U.S. 305 (1998)

("It is true that judicial review is normally not available under §1415(e)(2) until all administrative proceedings are completed, but as we have previously noted, parents may bypass that administrative process where exhaustion would be futile or inadequate."), and *Mrs. W. v. Tirozzi*, 832 F.2d 748, 759 (2d Cir. 1987) ("courts seldom defer to administrative agency when the issue involved in purely a legal question not involving either administrative experience or expertise").[3]

39.    The relief sought in this matter is (a) declaratory relief finding that Westhampton's discriminatory policy violates A.K.'s civil rights under the IDEA, the ADA, Section 504 of the Rehabilitation Act, and Section 1983, (b) a preliminary and permanent injunction against Westhampton, and (c) attorneys' fees and costs (should plaintiffs achieve substantially prevailing party status). Such relief cannot be obtained by way of a due process proceeding.  It would thus be futile and a colossal waste of time for A.K.'s parents to seek such relief from an Impartial Hearing Officer.

## THE RELIEF BEING SOUGHT

### Declarative Relief Under the ADA and Section 504 of the Rehabilitation Act

40.    Plaintiffs repeat and reallage paragraphs 1-39.

41.    Defendant Westhampton's policy and practice of refusing to educate seriously disabled students who are alternately assessed violates the ADA and Section 504.

42.    32.    The ADA states that "Congress finds that … discrimination against individuals with disabilities persists in such critical areas as employment, housing, public

---

[3] A.K.'s parents brought a Due Process action against the Remsenburg School District which sought a recommendation to have A.K. attend Westhampton Beach which resulted in a settlement wherein Remsenberg requested that Westhampton Beach allow A.K. to attend at Westhampton Beach (the settlement is attached hereto as Exhibit A). Westhampton denied this request.

accommodations, [and] *education* …" 42 U.S.C. §12101(a)(3) and that the purpose of the ADA is to, among other objectives, "provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C. §12101(b)(1) (emphasis added).

43.    Title II of the ADA provides that "no qualified individual with a disability shall, on the basis of disability, be excluded from participation in or be denied the benefits of the services, programs or activities of a public entity, or e subjected to discrimination by the public entity." 42 U.S.C. §12131(A).

44.    A.K. is a student who is diagnosed with Down Syndrome, is classified on his IEP with an intellectual disability, and as such, is a student with a qualified disability.

45.    The ADA regulations states that a public entity, in providing any aid, benefit, or service, may not, directly or through contractual, licensing, or other arrangements, on the basis of disability:

> Deny a qualified individual with a disability the opportunity to participate in or benefit from the aid, benefit, or service; …

> Otherwise limit a qualified individual with a disability in the enjoyment of any right, privilege, advantage, or opportunity enjoyed by others receiving the aid, benefit, or service.

> 28 CFR 35.130(b)(1)(i)-(vii).

46.    The ADA regulations also that that, "A public entity may not, directly or through contractual or other arrangement, utilize criteria or methods of administration:

> (i) That have the effect of subjecting qualified individuals with disabilities to discrimination on the basis of disability;
> (ii) That have the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the public entity's program with respect to individuals with disabilities; or

(iii) That perpetuates that discrimination of another public entity if both public entities are subject to common administrative control or are agencies of the same State.
28 CFR 35.130(b)(8).

47.    The regulations further provide in 28 C.F.R. 42.503 that:

(a) No qualified handicapped person shall, on the basis of handicap, be excluded from participation in, be denied the benefits of, or otherwise be subjected to discrimination under any program or activity which received Federal financial assistance.

(b) *Discriminatory actions prohibited.*
(1) A recipient may not discriminate on the basis of handicap in the following ways directly or through contractual, licensing, or other arrangements under any program or activity receiving Federal financial assistance:
(i) Deny a qualified handicapped person the opportunity accorded others to participate in the program or activity receiving Federal financial assistance;
(ii) Deny a qualified handicapped person an equal opportunity to achieve the same benefits that others achieve in the program or activity receiving Federal financial assistance;
(iii) Provide different or separate assistance to handicapped persons or classes of handicapped persons than is provided to others unless such action is necessary to provide qualified handicapped persons or classes of handicapped persons with assistance as effective as that provided to others;

48.    The drafters of Section 504 were not only concerned with [a student] receiving FAPE somewhere, but also that a federally funded program does not treat [the student] differently because [he is disabled.] Under Section 504, a state special school cannot hide behind the justification that another public school might provide a FAPE; it must show that somehow [the student] does not qualify for admission.  Unlike the IDEA, Section 504 does not only look at what is a FAPE, but also what is fair.

*Ellenberg v. N.M. Military Inst., 478* F.3d 1262, 1281-82 (10th Circuit) n.22 (quoting C.Walker, Note, *Adequate Access or Equal Treatment: Looking Beyond the IDEA to Section 504 in a Post-Schaffer Public School, 58 Stan. L.Rev. 1563, 1589 (2006).*

49.    Defendant Westhampton Beach School District is a public entity under the ADA and is a recipient of federal funding.  As a result, Westhampton is covered by and subject

to the ADA and Section 504 of the Rehabilitation Act. Westhampton's discriminatory policy of excluding all alternately assessed disabled students has resulted in Westhampton's direct discrimination against A.K. based on his specific disability. Westhampton is violating the ADA and Section 504 by excluding A.K., on the basis of his disability, from attending Westhampton and/or by denying him the benefits of their services, programs and activities, and by instead offering different and separate services to A.K. than are provided to other typically developing students and other less-impaired special needs students who are not alternately assessed. For whatever reason, Westhampton has *chosen* to adopt this discriminatory policy, and to apply that policy to A.K., thereby refusing to educate him based solely on his specific brand of disability.

### Declaratory Relief Under Section 1983 and the IDEA

50.    42 U.S.C. §1983 provides that every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or the proper proceeding for redress.

51.    The IDEA requires that a student's recommended program must be provided in the least restrictive environment (20 U.S.C. § 1412(a)(5)(A); 34 C.F.R. §§ 300.114(a)(2)(i), 300.116(a)(2); 8 NYCRR §200.1(cc).; 200.(a)(1)*; see Newington*, 546 F. 3d 111 (2008); *Gagliardo v. Arlington Central Sch. Dist.*, 489 F.3d 105, 115 (2007). In determining an appropriate placement in the LRE, the IDEA requires that students with disabilities be educated to the maximum extent appropriate with students who are

not disabled and that special classes, separate schooling, or other removal of students with disabilities from the general education environment may only occur when the nature or severity of the disability is such that the education in regular classes with the use of supplementary aides and services cannot be achieved satisfactorily (34 C.F.R. §§ 300.114(a)(2)(i), (ii), 300.116(a)(2); *see Newington*, 546 F. 3d 112, 120-21).

52.    When a student is placed in the LRE, it must (1) provide the special education needed by the student; (2) provide for education of the student to the maximum extent appropriate to the needs of the student with other students who do not have disabilities; and (3) *be as close as possible to the student's home*." (8 NYCRR 200.1(cc); see 8 NYCRR 200.4(d)(4)(ii)(b); see 34 C.F.R. § 300.116) (emphasis added).

53.    Remsenburg provided a program for A.K. for years in an inclusion setting. In that program, A.K. has made meaningful progress.

54.    Federal Regulation 34, C.F.R. 300.116 states that,

In determining the educational placement of a child with a disability, including a preschool child with a disability, each public agency must ensure that--

(a) The placement decision--

(1) Is made by a group of persons, including the parents, and other persons knowledgeable about the child, the meaning of the evaluation data, and the placement options; and

(2) Is made in conformity with the LRE provisions of this subpart, including Sec. Sec. 300.114 through 300.118;

(b) The child's placement--

(1) Is determined at least annually;

(2) Is based on the child's IEP; and

(3) Is *as close as possible to the child's home*;

15

(c) Unless the IEP of a child with a disability requires some other arrangement, *the child is educated in the school that he or she would attend if nondisabled;*

(d) In selecting the LRE, consideration is given to any potential harmful effect on the child or on the quality of services that he or she needs; and

(e) A child with a disability *is not removed from education in age-appropriate regular classrooms solely because of needed modifications in the general education curriculum.*

(emphasis added).

55.    It is not that Westhampton *cannot* provide a program that will allow A.K. to make progress, it simply refuses to even try.

56.    Remsenburg has offered to help Westhampton Beach to establish an appropriate program in A.K.'s LRE at Westhampton.

57.    Plaintiffs are not asking Westhampton to create a "new" program at Westhampton – they are only asking Westhampton to educate A.K. in an inclusive setting with appropriate supports and services – a task that Remsenburg has successfully taken on for years with A.K. and other disabled students.

58.    A.K. has a right to be educated in his home community, with his typically developing and disabled peers, where he will likely continue to reside into his adult life.

59.    The connection with local community is extremely important for children with disabilities like A.K.  For A.K., a FAPE in his LRE is at Westhampton where he can be educated in an ICT class and maintain the relationships that he has already formed, and will continue to form, with typically developing and disabled peers in his community.

60.    Defendant Westhampton Beach School District has acted, and continues to act, under the color of law in depriving A.K., a student with a disability who is alternately assessed to the severity of his disability, of his rights, privileges, and immunities secured

16

by the Constitution and laws (including the IDEA). Westhampton has adopted a policy and practice, and has acted according to that policy, in denying A.K. the opportunity to be educated at Westhampton in his LEA, together with his non-disabled peers and less-impaired special needs peers, and as a result, has deprived A.K. of his rights, privileges, or immunities secured by the Constitution and laws, including the IDEA.

61.    Defendant Westhampton is acting under the color of law and subjecting the plaintiffs to the deprivation of their right to Equal Protection and the deprivation of their rights under the ADA, Section 504, and the IDEA.

62.    Plaintiffs are being injured by Westhampton's policy and practice, and irreparably so.

<strong>INJUNCTIVE RELIEF</strong>

63.    Plaintiffs repeat and reallege paragraphs 1-62.

64.    Unless Westhampton opens its doors to A.K., A.K. and his parents will *continue* to suffer irreparable harm that cannot be compensated for in money damages.

65.    As a matter of law and statute, A.K. and his parents have demonstrated a likelihood of success on the merits.

66.    Plaintiffs have demonstrated that the futility exception to the IDEA's exhaustion requirement applies here.

67.    Under the unique circumstances of this case A.K. and his parents should be awarded appropriate injunctive relief without having to post a bond or undertaking.

68.    Accordingly, plaintiffs should be granted preliminary and permanent injunctive relief, without bond, restraining and enjoining defendants from denying A.K. admittance to Westhampton Beach school district, ordering Westhampton to admit A.K. as a 7th

grade student and allowing him to attend Westhampton Beach school district, and ordering Westhampton to meet with A.K.'s parents and Remsenburg to develop an appropriate IEP to be implemented at Westhampton in A.K.'s LRE.

### ATTORNEYS' FEES AND COSTS

69.     Plaintiffs repeat and reallege paragraphs 1-68.

70.     The ADA, Section 504, Section 1983, and the IDEA contain express fee-shifting provisions that allow for an award of attorneys' fees and costs to prevailing plaintiffs.

71.     In the event that plaintiffs shall emerge from these proceedings as a substantially prevailing party on any of their claims, this Court should declare such status and grant plaintiffs leave to file a fee application.

WHEREFORE, it is respectfully requested that this Court grant and issue the requested relief being sought by the plaintiffs.

Dated: New York, New York
        December 18, 2015

_____
Gary S. Mayerson (8413)
Jacqueline DeVore (2178)
Mayerson & Associates
*Attorneys for Plaintiffs*
330 West 38th Street, Suite 600
New York, New York 10018
(212) 265-7200
(212) 265-1735 (facsimile)

# P-2: ORIGINAL FEDERAL COURT DECISION

CLERK

5/9/2016 12:20 pm

U.S. DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
LONG ISLAND OFFICE

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------X
C.K., T.K., on behalf of A.K., and A.K.

Plaintiffs,

-against-

BOARD OF EDUCATION OF THE WESTHAMPTON
BEACH SCHOOL DISTRICT,

Defendant.
-------------------------------------------------------------------X

**MEMORANDUM OF
DECISION & ORDER**
15-CV-4743(ADS)(SIL)

**Mayerson & Associates**
*Attorneys for the Plaintiffs*
330 West 38th Street, Suite 600
New York, NY 10018
          By: Gary S. Mayerson, Esq., Of Counsel

**Devitt Spellman Barrett, LLP**
*Attorneys for the Defendant*
50 New York 111
Smithtown, NY 11787
          By: Anne C. Leahey, Esq.
                David H. Arntsen, Esq.
                Kelly E Wright, Esq., Of Counsel

**SPATT, DISTRICT JUDGE**

          This case arises from allegations by the Plaintiffs C.K., T.K., and A.K. (collectively, the

"Plaintiffs") that the Defendant the Board of Education of the Westhampton Beach School District (the

"WB Board") denied A.K., an adolescent diagnosed with Down Syndrome, admission into the

Westhampton Beach Union Free School District Middle School (the "Westhampton Middle School")

based on a pre-existing policy of discrimination against educating severely disabled students.

          On December 18, 2015, the Plaintiffs filed an amended complaint seeking a declaratory

judgment finding that the WB Board violated A.K.'s rights under the Individuals with Disabilities

Education Improvement Act, 20 U.S.C. § 1400 (the "IDEA"); Title II of the Americans with

Disabilities Act 42 U.S.C. § 12132 (the "ADA"); Section 504 of the Rehabilitation Act, 29 U.S.C. §

794(a) (the "Rehabilitation Act"); and the Civil Right Acts, 42 U.S.C. § 1983 ("Section 1983"). The

Plaintiffs also seek injunctive relief directing the WB Board to admit A.K. as a seventh grade student in the Westhampton Middle School, as well as attorneys' fees and costs.

Presently before the Court is a motion pursuant to Federal Rules of Civil Procedure ("Fed. R. Civ. P." or "Rules") 12(b)(1) and 12(b)(6) by the WB Board to dismiss the amended complaint in its entirety.

The Court is concerned with the allegations in the amended complaint that schools officials from the Westhampton Union Free School District ("Westhampton") and the WB Board allegedly refused to engage in any meaningful discussions with the Plaintiffs regarding potential accommodations that could meet A.K.'s needs and enable him to attend the Westhampton Middle School. However, in the Court's view, those concerns should first be addressed by local and state educational agencies, not by this Court. Therefore, for the reasons set forth below, the Rule 12(b)(1) motion by the WB Board is granted.

## I. BACKGROUND

The following facts are drawn from the amended complaint unless otherwise specified.

The Plaintiff A.K. was born on September 7, 2002. He is currently thirteen-years old and has Down Syndrome.

The Plaintiffs C.K. and T.K. are A.K.'s parents. A.K. resides with them in the Remsenburg/Speonk School District ("Remsenburg") located in Suffolk County.

Westhampton is a local educational agency and school district organized under New York law.

As will be discussed in detail below, the IDEA entitles disabled children, such as A.K. to a "free and appropriate public education." Pursuant to the IDEA and implementing New York statutes, a Committee on Special Education ("CSE") develops an Individualized Education Program ("IEP") for every disabled child to ensure that the child receives such an education. By law, the CSE consists of a team which includes the child's parents, teachers, representatives of the district, and where appropriate, the child.

Remsenburg is an elementary school district which ends at grade six.  When children finish sixth grade at Remsenburg, they ordinarily have a choice between attending middle school and high school in the Eastport/South Manor School District ("Eastport") or Westhampton.

To that end, Remsenburg entered into a contract with Westhampton by the terms of which Westhampton agreed that children of school age in grades 7 to 12 who reside in Remsenburg "shall be entitled to be to be taught in [Westhampton]."

A.K. attended elementary school through grade 6 in Remsenburg.  As a result of his disability, A.K. requires "alternate assessments," which means that he is not assessed in the same manner as typically developing less impaired special needs students.  Accordingly, A.K. does not take the same State and district-wide standard assessments that are administered to general education students and less impaired special needs students.  Rather, his academic performance is evaluated using "alternative performance indicators."

During 2013–2014, when he was in fifth grade, and 2014–2015, when he was in sixth grade, A.K. attended an Integrated Co-Teaching ("ICT") class at Remsenburg.  These classes were taught by a general education teacher and a special education teacher and included both typically developing students and students with special needs.

Pursuant to his IEP for those years, A.K. also received additional support and services from Remsenburg, including Speech and Language Therapy, Occupational Therapy, Physical Therapy, and a 1:1 teacher's aide, meaning the teacher's aide solely focused on him.

Although he is cognitively impaired, A.K. is well-adjusted socially.  To that end, he has made friends, attended birthday parties, and is involved in multiple community events and groups, such as little league, with his disabled and typically developing classmates in Remsenburg.  His classmates affectionately refer to him as "the Mayor" of his Sixth Grade class because of his beloved status.

The overwhelming majority of A.K.'s typically developing and special needs peers have chosen to attend the Westhampton Middle School, not the Eastport Middle School for the 2015 to 2016

school year.  As a result, it has always been A.K.'s desire to attend school in Westhampton so that he can remain with the majority of his friends from Remsenburg.  In addition, C.K. and T.K., A.K.'s parents, also want A.K. to attend school in Westhampton, in part, because A.K.'s younger typically developing siblings eventually will choose to attend the Westhampton Middle School when they reach the seventh grade.

However, the amended complaint alleges "upon information and belief" that the WB Board has for decades refused to educated more seriously impaired, alternatively assessed special needs students, such as the Plaintiff.  It further alleges "upon information and belief" that Westhampton Middle and High Schools have never educated a student with Down Syndrome.

In 2007 and 2008, when A.K. first entered the Remsenburg Elementary School, his parents were allegedly informed by unnamed individuals that A.K. would never be permitted to attend Westhampton schools once he reached the seventh grade because of his disability.

In the 2013-2014 and 2014-2015 school years, A.K.'s parents reached out to Westhampton administrators to start making arrangements for A.K. to attend the Westhampton Middle School beginning in 2015-2016.  Allegedly, these officials refused to engage with A.K.'s parents.

On March 30, 2015, the CSE held a meeting during which members from Remsenburg recommended that due to A.K.'s "instructional  and management needs," A.K. required a school that offered a "8:1:1" student-teacher staffing ratio — meaning a class with eight students, one teacher, and one teacher's aide.  (See Seaman Aff., Ex. C, at p. 2.)  In response, A.K.'s parents stated their preference was for A.K. to attend middle school and high school in Westhampton and rejected the "8:1:1" recommendation because the Westhampton Middle School only had a "15:1:1" program.  (Id. at p. 3.)  Instead, they proposed that Westhampton adopt a hybrid program whereby A.K. would be placed into a 15:1:1 class and receive academic instruction for most of the day in a 1:1 resource room. (Id.)  Jan Achilich ("Achilich"), the CSE Chair and Special Education Director, adjourned the CSE

meeting so that she could propose the idea to the New York State Education Department ("NYSED"). (See id.)

On April 24, 2015, the CSE reconvened.  At the meeting, Achilich stated that NYSED's Regional Office advised her that the recommendation by A.K.'s parents that A.K. be placed in a resource room with 1:1 teacher-student ratio for A.K.'s primary academic instruction was not authorized under the IDEA and New York State regulations.  (See id.)

In light of this information, the CSE recommended that A.K. be placed in a 8:1:2 special class. A.K.'s parents disagreed with the CSE's recommendation.  (See id. at pp. 3–4.)

On May 22, 2015, C.K. and T.K. filed a due process complaint against Remsenburg on A.K.'s behalf requesting an impartial hearing and seeking a less restrictive placement for A.K. in the Westhampton Middle School for the 2015–2016 school year.  (See Compl., Ex. B; see also Seaman Aff., Ex. C.)

On June 8, 2015, Remsenburg filed an answer to the due process complaint, denying the Plaintiffs' claims.  (See Seam Aff., Ex. C.)

On June 17, 2015, the parties held a resolution conference during they agreed to the outlines of a stipulation to resolve the Plaintiffs' due process complaint (the "Stipulation").  (See Seaman Aff., Ex. E.)

Under the terms of the Stipulation, Remsenburg and the Plaintiffs agreed that A.K.'s IEP would be amended for the 2015-2016 year to require the following special services:

(a) a 15:1:1 small, self-contained class placement;
(b) a resource room in a 3:1:1 setting, 5 times per week for 40 minutes;
(c) a 1:1 teaching assistant for 6 hours 30 minutes per day;
(d) a consultant for integration (support for school staff) sixty hours for the school year; [and]
(e) the related services of speech language therapy, physical therapy and occupational therapy . . . .

(Id. at ¶ 2.)

In addition, the Stipulation required Remsenburg to "submit a letter to Westhampton Beach to have the program as outlined above, implemented at Westhampton Beach Middle School. Should Westhampton Beach accept the student, the District shall cooperate to have the program implemented." (Id.).

On July 9, 2015, in compliance with the terms of the Stipulation, Lisa H. Hutchenson, Esq. ("Hutchenson"), an attorney representing Remsenburg, sent a letter to Kevin Seaman, Esq. ("Seaman"), counsel for Westhampton. (See Seaman Aff., Ex. A.) In the letter, Hutchenson set forth the above-described changes to A.K.'s IEP and stated:

> As a public school, [Remsenburg] believes that [Westhampton] is able to implement the referenced program. Although your client indicates there is no teaching assistant available to work with your students, [Remsenburg] believes one can be obtained for fulfilling the needs of this child's IEP. Similarly, [Remsenburg] believes that the general education curriculum within the 15:1:1 can be appropriately modified in order to meet [A.K.'s] academic needs. Likewise, to the extent [Westhampton] does not currently carry a 3:1:1 resource room, [Remsenburg] believes such [an] accommodation can easily be created to meet the needs of [A.K.]. In other words, while implementation of this unique IEP may be [a] departure from [Westhampton's] usual practices, [Remsenburg] believes that it can be implemented with little burden on [Westhampton].

(Id.)

On July 14, 2015, Westhampton filed a letter with Robert Briglio, Esq. ("Briglio"), the impartial hearing officer presiding over the Plaintiffs' due process complaint, requesting permission to intervene in the matter so that it could have an opportunity to be heard with respect to the Stipulation. (See Seaman Aff., Ex. D, at p.1) Specifically, according to Westhampton, it was not "in a position to accommodate the severely intellectually disabled child [i.e. A.K.] in a 15:1:1 class that possesses Regents-track students being administered the State's intensive core curriculum." (Id. at p. 2.)

On August 3, 2015, prior to a decision by Biglio on Westhampton's motion to intervene, the Plaintiffs and Remsenburg finalized a stipulation of settlement and general release resolving the Plaintiffs' due process complaint. (See Compl., Ex. B.)

After signing the Stipulation, the Plaintiffs again offered to meet with the WB Board to "create an appropriate IEP program for A.K. to be implemented" at the Westhampton Middle School.

6

However, the Board again denied the Plaintiffs' request and refused to admit A.K. into the Westhampton Middle School.

On August 13, 2015, the Plaintiffs commenced this action against the WB Board requesting an injunction directing the Board to permit A.K. to attend the Westhampton Middle School for the 2015–2016 school year.

As noted, on December 18, 2015, the Plaintiffs amended their complaint, adding a claim for a judgment declaring that the WB Board implemented a discriminatory policy in violation of A.K.'s rights under the IDEA; the ADA; Section 504 of the Rehabilitation Act; and Section 1983.

During the pendency of this action, A.K. has repeated the Sixth Grade and continued to attend an ICT class at Remsenburg.

Presently, the WB Board moves to dismiss the amended complaint pursuant to Fed. R. Civ. P. 12(b)(1) because it asserts that (i) the Plaintiffs failed to exhaust their claims against the WB Board as is required under the IDEA; and (ii) the Plaintiffs lack standing because they do not have a legally protected interest in having A.K. attend Westhampton Middle School.

In addition, the WB Board moved to dismiss the amended complaint pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state a cause of action under the IDEA; Section 1983; the ADA; and the Rehabilitation Act.

For their part, the Plaintiffs dispute each of the contentions by the WB Board.

The Court agrees that the Plaintiffs have failed to exhaust their claims under the IDEA and therefore, the Court lacks subject matter jurisdiction over this action. Accordingly, the Court need not reach the WB Board's standing or its Rule 12(b)(6) arguments.

## II. DISCUSSION

### A. As to the Standard of Review

'"Determining the existence of subject matter jurisdiction is a threshold inquiry and a claim is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court

7

lacks the statutory or constitutional power to adjudicate it.'" Morrison v. Nat'l Australia Bank Ltd.,

547 F.3d 167, 170 (2d Cir. 2008) (quoting Arar v. Ashcroft, 532 F.3d 157, 168 (2d Cir. 2008)). "In

resolving a motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1), a district

court . . . may refer to evidence outside the pleadings." Makarova v. United States, 201 F.3d 110, 113

(2d Cir. 2000). Thus, the Court will consider the documents related to the due process complaint filed

by the Plaintiffs against Remsenburg offered by the WB Board in support of its motion to dismiss even

though those documents are not attached to the amended complaint. See Robinson v. Gov't of

Malaysia, 269 F.3d 133, 141 (2d Cir. 2001) ("Our rule is that, on a 'challeng[e][to] the district court's

subject matter jurisdiction, the court may resolve disputed jurisdictional fact issues by reference to

evidence outside the pleadings, such as affidavits.'") (alterations in original) (quoting parenthetically

Antares Aircraft, L.P. v. Federal Republic of Nigeria, 948 F.2d 90, 96 (2d Cir.1991), *vacated on other

grounds*, 505 U.S. 1215, 112 S.Ct. 3020, 120 L.Ed.2d 892 (1992)).

'"The party invoking federal jurisdiction bears the burden of establishing' that jurisdiction

exists." Sharkey v. Quarantillo, 541 F.3d 75, 82 (2d Cir. 2008) (quoting Lujan v. Defenders of

Wildlife, 504 U.S. 555, 561, 112 S. Ct. 2130, 119 L.Ed.2d 351 (1992)). "'[W]here, as here, the case is

at the pleading stage and no evidentiary hearings have been held,' however, '[i]n reviewing the grant

of a motion to dismiss [under Rule 12(b)(1) ] we must accept as true all material facts alleged in the

complaint and draw all reasonable inferences in the plaintiff's favor.'" Conyers v. Rossides, 558 F.3d

137, 143 (2d Cir. 2009) (alterations in original) (quoting Sharkey, 541 F.3d at 83). "Nevertheless,

even 'on a motion to dismiss, courts 'are not bound to accept as true a legal conclusion couched as a

factual allegation.'" Id. (quoting Sharkey, 541 F.3d at 83).

## B. As to the Relevant Statutory Framework

The purpose of the IDEA is, among other things, to "ensure that all children with disabilities

have available to them a free appropriate public education that emphasizes special education and

related services designed to meet their unique needs and prepare them for further education, employment, and independent living[.]" 20 U.S.C.A. § 1400(1)(A).

To that end, "[t]he IDEA requires states receiving federal special education funding to provide disabled children with a [Free and Appropriate Public Education or "FAPE"]." T.M. ex rel. A.M. v. Cornwall Cent. Sch. Dist., 752 F.3d 145, 151 (2d Cir. 2014) (citing M.W. ex rel. S.W. v. N.Y.C. Dep't of Educ., 725 F.3d 131, 135 (2d Cir. 2013)). "To ensure that qualifying children receive a FAPE, a school district must create an individualized education program ("IEP") for each such child." R.E. v. New York City Dep't of Educ., 694 F.3d 167, 175 (2d Cir. 2012). The IEP, in turn, is "a written statement that 'sets out the child's present educational performance, establishes annual and short-term objectives for improvements in that performance, and describes the specially designed instruction and services that will enable the child to meet those objectives.'" D.D. ex rel. V.D. v. New York City Bd. of Educ., 465 F.3d 503, 507-08 (2d Cir. 2006) (quoting Honig v. Doe, 484 U.S. 305, 311, 108 S. Ct. 592, 98 L.Ed.2d 686 (1988)); see also 20 U.S.C. § 1414(d)(1)(A) (defining "IEP").

As already noted, the IEP is developed by a team, which is known in New York as a CSE, that includes the child's parents, teachers, and representatives of the local education agency. See 20 U.S.C. § 1414(d)(1)(B); N.Y. Educ. Law § 4410–b(1)(c). "As a general rule, [the] IDEA requires that, at least once a year, the CSE review the IEP and make any necessary revisions." Kalliope R. ex rel. Irene D. v. New York State Dep't of Educ., 827 F. Supp. 2d 130, 136 (E.D.N.Y. 2010) (citing 20 U.S.C. § 1414(d)(4)(A)(i)).

## C. As to Whether the Exhaustion Requirement Applies to the Plaintiffs' Claims

As noted, the amended complaint seeks a declaratory judgment that the WB Board implemented a discriminatory policy in violation of the IDEA, the ADA, the Rehabilitation Act, and Section 1983; and a preliminary and permanent injunction against the WB Board directing it to admit A.K. into the seventh grade class of Westhampton Middle School.

The WB Board asserts that all of the Plaintiffs' claims — including the ADA, Rehabilitation Act, and Section 1983 claims — are subject to the exhaustion requirement of the IDEA. (See the Board's Mem. of Law at 11, 15–17.) As there is no dispute that the Plaintiffs did not exhaust their claims prior to commencing this action, the Board contends that the Plaintiffs' claims fail to satisfy the exhaustion requirement, and therefore, this case should be dismissed for lack of subject matter jurisdiction. (See id.)

For their part, the Plaintiffs do not dispute that their claims are subject to the exhaustion requirement of the IDEA but contend that the claims falls under an exception to that requirement for claims that allege systemic violations that cannot be remedied on the administrative level. (See the Pls.' Mem. of Law at 9–14.) The Court disagrees.

"Under the educational scheme of the IDEA . . . , parents of students with disabling conditions are guaranteed 'both an opportunity for meaningful input into all decisions affecting their child's education and the right to seek review of any decisions they think inappropriate.'" Cave v. E. Meadow Union Free Sch. Dist., 514 F.3d 240, 245 (2d Cir. 2008) (quoting Honig v. Doe, 484 U.S. 305, 311–12, 108 S. Ct. 592, 98 L.Ed.2d 686 (1988)). In that regard, "[p]arents may request a hearing to present complaints relating to the 'identification, evaluation, or educational placement of the child, or the provision of a free appropriate public education.'" J.S. ex rel. N.S. v. Attica Cent. Sch., 386 F.3d 107, 112 (2d Cir. 2004) (quoting 20 U.S.C. § 1415(b)(6)). Under New York law, parents may avail themselves of two-tiers of administrative review of IEPs:

> First, an impartial hearing officer is selected from a list of certified officers and appointed by the local board of education or the competent state agency to conduct the initial hearing and issue a written decision. That decision can then be appealed to a state review officer of the New York Education Department.

Cave, 514 F.3d at 245 (citing Heldman on Behalf of T.H. v. Sobol, 962 F.2d 148, 152 (2d Cir. 1992))

"'It is well settled that the IDEA requires an aggrieved party to exhaust all administrative remedies before bringing a civil action in federal or state court.'" Coleman v. Newburgh Enlarged City Sch. Dist., 503 F.3d 198, 204-05 (2d Cir. 2007) (alteration omitted) (quoting J.S, 386 F.3d at

112). "Failure to exhaust the administrative remedies deprives the court of subject matter jurisdiction." Cave, 514 F.3d at 245.

"The IDEA's exhaustion requirement was intended to channel disputes related to the education of disabled children into an administrative process that could apply administrators' expertise in the area and promptly resolve grievances." Polera v. Bd. of Educ. of Newburgh Enlarged City Sch. Dist., 288 F.3d 478, 487 (2d Cir. 2002). Specifically, the "'[e]xhaustion of the administrative process allows for the exercise of discretion and educational expertise by state and local agencies, affords full exploration of technical educational issues, furthers development of a complete factual record, and promotes judicial efficiency by giving these agencies the first opportunity to correct shortcomings in their educational programs for disabled children.'" Id. (quoting Hoeft v. Tucson Unified Sch. Dist., 967 F.2d 1298, 1303 (9th Cir. 1992)).

"Importantly, complainants must overcome this significant procedural hurdle not only when they wish to file a suit under the IDEA itself, but also whenever they assert claims for relief available under the IDEA, regardless of the statutory basis of their complaint." Cave, 514 F.3d at 246; see also 20 U.S.C. § 1415(1). In other words, "[t]he IDEA statute requires plaintiffs with any claims related to the education of disabled children, whether brought under IDEA or another statute (e.g., the Rehabilitation Act), to exhaust the administrative remedies available under IDEA prior to initiating a federal lawsuit." Kalliope R. ex rel. Irene D., 827 F. Supp. 2d at 137.

As noted, the Plaintiffs do not dispute that their claims under the IDEA, the ADA, the Rehabilitation Act, and Section 1983 are all subject to the exhaustion requirement. However, they contend their claims fall under the "futility" exception to the exhaustion requirement. (See the Pls.' Mem. of Law at 9–14.)

In that regard, the Second Circuit has stated that "[t]he exhaustion requirement is excused when exhaustion would be futile because the administrative procedures do not provide an adequate remedy."

<u>Cave</u>, 514 F.3d at 249 (citing <u>Honig v. Doe</u>, 484 U.S. 305, 108 S. Ct. 592, 98 L. Ed. 2d 686 (1988)).

"To show futility, a plaintiff must demonstrate that 'adequate remedies are not reasonably available' or that 'the wrongs alleged could not or would not have been corrected by resort to the administrative hearing process.'" <u>Coleman</u>, 503 F.3d at 205 (quoting <u>J.G. v. Bd. of Educ. of Rochester City Sch. Dist.</u>, 830 F.2d 444, 447 (2d Cir. 1987)). "The party seeking to avoid exhaustion bears the burden of showing futility." <u>Cave</u>, 514 F.3d at 249 (citing <u>Polera</u>, 288 F.3d at 488 n. 8).

One potential basis for futility that the Second Circuit has previously recognized is where a plaintiff alleges "systemic violations that could not be remedied by local or state administrative agencies 'because the framework and procedures for assessing and placing students in appropriate educational programs were at issue, or because the nature and volume of complaints were incapable of correction by the administrative hearing process.'" <u>Id.</u> (quoting <u>J.S. ex rel. N.S.</u>, 386 F.3d at 114). "The rationale behind this exception is that while the administrative hearing officers have the authority to enforce established regulations, policies and procedures, they generally do not have the authority to set new policies or to alter existing ones." <u>King v. Pine Plains Cent. Sch. Dist.</u>, 918 F. Supp. 772, 781 (S.D.N.Y. 1996). Accordingly, "requiring a parent to exhaust his administrative remedies when he is challenging a generally applicable policy or procedure would be futile." <u>Id.</u>

For example, in <u>J.S. ex rel. N.S. v. Attica Cent. Sch.</u>, 386 F.3d 107 (2d Cir. 2004), the Second Circuit found that the claims of six students against a school district under the IDEA, the Rehabilitation Act, and Section 1983 did fall within the systemic violation exception to the exhaustion requirement because "the complaint d[id] not challenge the content of Individualized Education Programs, but rather the School District's total failure to prepare and implement Individualized Education Programs." <u>Id.</u> at 115. The complaint also included numerous examples of systemic problems at the school district, including:

> failure to perform timely evaluations and reevaluations of disabled children; failure to provide parents with required procedural safeguards regarding identification, evaluation, and accommodation of otherwise disabled children; and failure to perform legally required responsibilities in a timely manner, including providing and

implementing transition plans, transitional support services, assistive technology services, and declassification services for children with disabilities.

Id.

The Plaintiffs also rely on several district court cases to support their contention that their allegations of "systemic violations" and a discriminatory policy on the part of Westhampton fall within the futility exception to the exhaustion requirement of the IDEA.

First, in Michaels ex rel. Michaels v. Mills, No. 02-CV-0555E (F), 2004 WL 816918, at *1 (W.D.N.Y. Feb. 14, 2004), a mentally and emotionally disabled student asserted claims under the IDEA and other statutes against New York State educational officials arising from his placement into an adolescent treatment center and a residential education program. The court found that the student's claim arising from his placement at the treatment center was subject to the exhaustion requirement because it involved "factual and legal questions" that the court concluded were better left "to the expertise of the involved agencies." Id. at *3. However, the court found that the student's claim arising from his placement into the residential education program did fall into the futility exception because "[p]laintiff has alleged that defendants have adopted a policy or practice of failing to provide sufficient programs for disabled students – such as himself – in [Western New York] and that such policy or practice violates, inter alia, the IDEA." Id.

Second, in King v. Pine Plains Cent. Sch. Dist., 918 F. Supp. 772 (S.D.N.Y. 1996), the parents of a disabled student challenged a CSE's decision to place their child in a local public school instead of a residential treatment facility despite documented evidence of the student's behavioral issues. Id. at 777. The parents in that case filed a due process complaint against the school district, appealing the IEP placement recommendation. Id. During the pendency of their due process appeal, a family court judge in a separate proceeding ordered the student to be placed in the treatment center. Id. Subsequently, an Impartial Hearing Officer ("IHO") issued a decision finding that the student's IEP was inadequate and recommending that he be placed in a residential treatment facility. Id. However, the IHO ruled that the parents were not entitled to reimbursement from the school district for costs

associated with sending their child to the treatment center. Id. After exhausting their administrative

appeals against the school district, the parents brought suit in federal court against the school district

and the Duchess County Department of Social Services ("Duchess DSS"), among other state agencies,

seeking reimbursement for their tuition expenses and alleging violations of the IDEA and other federal

statutes. See id. at 776.

In King, DSS moved to dismiss the complaint for lack of subject matter jurisdiction because the

parents had failed to exhaust their administrative claims against DSS. See id. at 780–81. The district

court denied that motion, finding that the claims against DSS fell within the futility exception to the

exhaustion requirement. See id. at 780–81. The court noted that DSS's decision to require the parents

to financially contribute to their child's placement in a treatment center after a family court ruled that it

was necessary for the benefit of his education was a violation of the IDEA. See id. Because the

complaint alleged that the DSS decision was made pursuant to a "generally applicable policy" which

violated the law, the court found that resort to administrative proceedings would have been futile

because the IHO would not have authority to change such a policy. Id.

Third, in Andree ex rel. Andree v. Cty. of Nassau, 311 F. Supp. 2d 325 (E.D.N.Y. 2004) (Spatt,

J), the parents of two children asserted that their rights under the IDEA and other federal statutes were

violated when the Nassau County Department of Social Services ("Nassau DSS") imposed medical

liens on the children's personal injury awards for reimbursement of monies paid by the Nassau DSS to

the children's local schools for special education and related services. This Court found that the DSS

actions violated the IDEA. See id. at 333. Further, as the complaint alleged that Nassau DSS filed

improper medical liens against the two students as part of a de facto policy that was contrary to the

law, the Court found that the exhaustion requirement of the IDEA did not apply to their claims. Id. at

333–34.

However, courts in this Circuit have found that allegations of discrimination on the part of

school districts are not sufficient to excuse the IDEA exhaustion requirement in cases where those

allegations are tied to the events, conditions, or consequences of an individual student's IEP. That is because those complaints can be remedied at the administrative level and therefore, resort to the administrative process would not be futile. See Baldessarre v. Monroe-Woodbury Cent. Sch. Dist., 820 F. Supp. 2d 490, 505 (S.D.N.Y. 2011) ("Because all of Plaintiffs' claims of discrimination relate to the interplay between Daniel's disability and his education, whether the Amended Complaint adequately alleges facts sufficient to state a claim under these other statutes is entirely irrelevant."); Wang v. Williamsville Cent. Sch. Dist., No. 08-CV-575S, 2010 WL 1630466, at *6 (W.D.N.Y. Apr. 21, 2010) ("Plaintiffs' attempt to recast their claims is unavailing. What they are alleging, in essence, is that the District knew it had certain obligations to KG because of his medical conditions, but it failed to act on that knowledge when it let another factor take precedence. The gravamen of their claim is the failure to provide appropriate services to KG; the purported reason for the failure — race discrimination — is secondary.").

For example, in Cave v. E. Meadow Union Free Sch. Dist., 514 F.3d 240 (2d Cir. 2008), the parents of a hearing-impaired student asserted claims under Section 1983, the ADA, and several New York statutes arising from a CSE's decision to deny his parents' request to the district to permit him to bring a service dog to school. On appeal, the child's parents asserted that the IDEA exhaustion requirement did not apply to their claim because their claim was "not one of violation of the IDEA's mandate for the provision of a 'free appropriate public education' to each disabled student, but a claim of unlawful discrimination." Id. In other words, the plaintiffs asked the court to treat "John, Jr. not as a student who is being deprived of an appropriate public education, but as a person who is being denied access to a public facility by reason of his disability and his non-educational need for a service dog." Id.

In Cave, the Second Circuit rejected the plaintiffs' argument, stating, "We are not convinced that appellants' claims are materially distinguishable from claims that could fall within the ambit of the IDEA." Id. The Circuit Court reasoned that the school officials testified before the district court that

they denied the student's request for a service dog because "his existing IEP would have to be changed to accommodate the concerns of allergic students and teachers and to diminish the distractions that Simba's presence would engender." Id. The Court found that "[t]hese issues implicate John, Jr.'s IEP and would be best dealt with through the administrative process." Id. at 247–48. In addition, the Court rejected the plaintiffs' related argument that the case implicated the futility doctrine:

> Here, an individual student complains about the school's denial of his request that a service dog be permitted to accompany him in class. There is no allegation of a system-wide violation of the IDEA's mandates or of a district-wide policy of discrimination against hearing-impaired students. Nor do appellants make a plausible argument that the administrative process is so structurally tainted that they would not have been afforded a fair and impartial forum to present their claims.

Id. at 250.

In Hope v. Cortines, 872 F. Supp. 14, 16 (E.D.N.Y.), aff'd, 69 F.3d 687 (2d Cir. 1995), the parents of a dyslexic student sought a preliminary injunction in federal court compelling the New York City Board of Education and several of its representatives to change the student's IEP to adopt the treatment recommendations provided by an independent medical expert who had evaluated the student. As in Cave, the plaintiffs in Hope sought to reframe their claims against the school as discrimination claims, asserting that the school's refusal to provide the plaintiff-student with services was the result of unlawful discrimination on the basis of his race and his disability. See id. at 16.

However, the district court in Hope found otherwise and applied the IDEA exhaustion requirement, reasoning:

> [The] Plaintiffs request for temporary and permanent injunctive relief imposing upon defendants the requirement to provide the services and accommodations identified in the Mount Sinai Report indisputably raises issues addressable under IDEA. Plaintiffs in substance challenge the adequacy of the IEP created for Moyo and seek imposition of their own more expansive IEP. This is precisely the type of remedy best fashioned by the educational experts skilled in developing such programs and provides a textbook example of the types of cases justifying administrative exhaustion.

Id. at 21 (alteration added).

In addition, the court in Hope found that the futility exception for systemic violations and policies contrary to law did not excuse the plaintiffs' failure to exhaust their claims. See id. at 22. In

16

so doing, the court acknowledged that the "plaintiffs allege in conclusory terms that '[t]he practices and actions complained of herein are, on information and belief, typical of the practices and actions experienced by African–American and Latino students in need of supportive services within the defendant Board of Education.'" Id. at 23. It further noted that "[t]his allegation, which the [c]ourt deems true for purposes of this analysis, arguably states a facial violation of IDEA on the ground that defendants engaged in wide-spread, systemic discrimination and 'adopted a policy or pursued a practice of general applicability that is contrary to the law.'" Id.

However, the court found that these alleged policies related to the action of local schools, not State actors. See id. Therefore, even assuming this allegation to be true, the court found that allegations against a local school were better suited to the States under the IDEA's administrative scheme than a federal district court because the "purpose of the exhaustion doctrine would be undercut by allowing plaintiffs to seek redress in this tribunal rather than affording the state (and defendants) the opportunity to rectify any errors." Id.

In the present case, the Plaintiffs, similar to the plaintiffs in Cave and Hope, seek to re-cast their claims as arising from the WB Board's alleged discriminatory policy of refusing to admit severely disabled children into their schools — "[t]he Plaintiffs do not seek an 'optimal program' for A.K. . . . . [The] Plaintiffs simply ask that [the] Defendant Westhampton be enjoined from discriminating against A.K. based solely on the nature of his disability[.]" (See the Pls.' Opp'n Mem. of Law at 6.) To that end, they seek declaratory relief stating that the WB Board's alleged discriminatory policy violates the IDEA, the ADA, the Rehabilitation Act, and Section 1983; as well as injunctive relief directing the WB Board to admit A.K. into the Westhampton Middle School for the 2016 to 2017 school year.

However, in the Court's view, the latter request — namely, an injunction permitting the Plaintiff to attend the Westhampton Middle School — is the Plaintiffs' primary request for relief in this action. Indeed, the amended complaint makes this clear: "[The] Plaintiffs are simply asking

Westhampton to cease discriminating against A.K., and meet with A.K.'s parents and representatives from Remsenburg to create an IEP for A.K. to attend an inclusive program at Westhampton with appropriate services."

It is clear that a challenge to the placement of a disabled student is a matter that is within the ambit of the administrative scheme provided by the IDEA, which explicitly provides parents with an opportunity to present a complaint to an impartial IHO "with respect to any matter relating to the identification, evaluation, or <u>educational placement of the child</u>, or the provision of a free appropriate public education to such child[.]" 20 U.S.C.A. § 1415(A) (emphasis added).

The Court has some concern as to the validity of the claims of the WB Board that it is incapable of creating a program that would accommodate the A.K.'s disability due to a lack of resources. (<u>See</u> Ambrosini Aff.) It is also, of course, understanding of the frustration expressed by the Plaintiffs as a result of the apparent refusal by Westhampton officials to meaningfully engage with the Plaintiffs in an effort to find a way to accommodate A.K. in this important matter.

However, the Plaintiffs' issues with Westhampton and their justifications for not admitting A.K. are initially better addressed to the local and state education agencies who are "uniquely well suited to review the content and implementation of IEPs . . . and to determine what changes, if any, are needed." <u>Cave</u>, 514 F.3d at 248. Indeed, the Plaintiffs did file a due process complaint against Remsenburg with an IHO seeking a "less restrictive placement" for A.K. in the Westhampton Middle School for the 2015–2016 school year. (<u>See</u> Compl., Ex. B, at p. 1.) Had they not initially settled the matter, the IHO could have directed A.K.'s placement into the Westhampton Middle School. The fact that the Plaintiffs failed to see this process through does not give them the right to proceed to federal court seeking the same relief that was and still is available to them at the state and local level under the IDEA. <u>See Hope</u>, 872 F. Supp. at 21 ("Plaintiffs in substance challenge the adequacy of the IEP created for Moyo and seek imposition of their own more expansive IEP. This is precisely the type of

18

remedy best fashioned by the educational experts skilled in developing such programs and provides a textbook example of the types of cases justifying administrative exhaustion.").

The Plaintiffs also allege "upon information and belief" that Westhampton has a long-standing policy of discrimination against severely disabled students. Even assuming the truth of this allegation, an IHO has the authority to authorize the relief that the Plaintiffs seek as a result of that alleged policy — namely, compelling Westhampton to accommodate the needs of A.K. and thereby the needs of other severely disabled students like him. To permit the Plaintiffs to circumvent that IDEA remedy would thwart the purpose of the IDEA exhaustion requirement, which was created so that "States have ultimate responsibility for ensuring that local educational programs comply with the IDEA." Hope, 872 F. Supp. at 23 (quoting Hoeft v. Tucson Unified Sch. Dist., 967 F.2d 1298, 1307 (9th Cir. 1992)).

Nor does the Court find the cases relied on by the Plaintiffs and described above to be controlling. That is because Andree or King involved challenges to de facto illegal reimbursement policies by county departments that were not the subject of the IDEA and therefore, could not be remedied by resort to the IDEA administrative process. See Andree ex rel. Andree, 311 F. Supp. 2d at 333 (challenging a policy by the DSS to assert liens against disabled students who received personal injury awards); King, 918 F. Supp. at 782 ("If, as plaintiffs allege, DSS implements that policy by seeking support orders from the Family Court for disabled children whose placements are necessary to provide them with appropriate educations, that policy violates the IDEA."). Similarly, Michaels involved a challenge to an alleged discriminatory policy across all of Western New York that could not have been remedied by a due process hearing under the IDEA because an IHO only has the authority to review the educational decisions of local school districts. See Michaels, 2004 WL 816918, at * 3.

By contrast, here the Plaintiffs challenge Westhampton's refusal to create a program that could accommodate the services required under A.K.'s IEP, an issue which, as noted above, Congress has expressly decided should first be addressed by local and state education agencies.

For these reasons, the Court finds that the Plaintiffs have failed to demonstrate that an exception to the exhaustion requirement of the IDEA is applicable.  As there is no dispute that (i) the IDEA exhaustion requirement applies to all of the Plaintiffs' claims; and (ii) the Plaintiffs failed to exhaust their administrative remedies, the Court finds that it lacks subject matter jurisdiction over the Plaintiffs' claims.

## III. CONCLUSION

For the foregoing reasons, the Rule 12(b)(1) motion by the WB Board to dismiss the amended complaint in its entirety for lack of subject matter jurisdiction is granted.  This action is dismissed without prejudice and with leave to renew in federal court if and when the Plaintiffs properly exhaust their claims under the IDEA.  The Clerk of the Court is directed to close this case.

**SO ORDERED**
Dated: Central Islip, New York
May 9, 2016

*/s/ Arthur D. Spatt*
ARTHUR D. SPATT
United States District Judge
