UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X

A.K, a minor (CHRISTIAN KILLORAN,
as parent),

      Plaintiffs,

  -against-

WESTHAMPTON  BEACH  SCHOOL
DISTRICT,  MICHAEL  RADDAY-
SUPERINTENDENT,  SUZANNE  M.
MENSCH, HALSEY C. STEVENS, STACY
RUBIO, CLAIRE BEAN, JAMES N. HULME,
JOYCE DONNESSON, and GEORGE R. KAST,
JR. (individually and collectively as Board
of Education Members),

      Defendants.
-------------------------------------------------------------------X

CHRISTIAN  KILLORAN  and  TERRIE
KILLORAN, individually and on behalf of their
infant son, A.K., a minor,

      Plaintiffs,

  -against-

WESTHAMPTON  BEACH  SCHOOL
DISTRICT, MICHAEL RADDAY (individually
and  in  his  official  capacity  as
SUPERINTENDENT),  SUZANNE  M.
MENSCH, HALSEY C. STEVENS, STACY
RUBIO, CLAIRE BEAN, JAMES N. HULME,
JOYCE DONNESSON, and GEORGE R.
KAST, JR. (individually and in their respective
official  capacities  as  Board  of  Education
Members),

      Defendants.
-------------------------------------------------------------------X

**REPORT AND
RECOMMENDATION**
17-cv-0866 (GRB)(SIL)

**STEVEN I. LOCKE, United States Magistrate Judge:**

Presently before the Court, on referral from the Honorable Gary R. Brown for Report and Recommendation, are Plaintiffs' motions for summary judgment as to: (1) Plaintiffs' Fifth Cause of Action appealing both the independent hearing officer ("IHO") Dr. James A. Monk's ("IHO Monk") and state review officer ("SRO") Steven Krolak's ("SRO Krolak") 2017 decisions upholding Defendants' educational program recommendations; and (2) Plaintiffs' Seventh Cause of Action appealing SRO Krolak's 2018 decision denying a request to modify A.K.'s educational placement during the pendency of litigation. *Pro se* Plaintiffs Christian Killoran and Terrie Killoran (together, the "Parents"), individually and as parents to A.K., their child with Down syndrome (collectively, the "Plaintiffs"), commenced this action against Defendants Westhampton Beach School District ("Westhampton" or the "District"), Michael Radday, Suzanne M. Mensch, Halsey C. Stevens, Stacy Rubio, Claire Bean, James N. Hulme, Joyce Donnesson and George R. Kast, Jr. (collectively with the District, "Defendants") by way of Complaint dated February 16, 2017. *See* Complaint ("Compl."), Docket Entry ("DE") [1]. Plaintiffs' Second Amended Consolidated Complaint alleges violations of (1) the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400, *et seq.*; (2) the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.*; (3) 42 U.S.C. § 1983; and (4) Section 504 of the Rehabilitation Act, 29 U.S.C. § 794(a) *et seq.* *See* Second Amended Consolidated Complaint ("SACC"), DE [52]. Plaintiffs' SACC additionally: (5) appeals the 2017 administrative decisions of IHO Monk and SRO Krolak; (6) seeks an equitable order directing Defendants to enroll A.K. and to utilize an inclusion consultant to design A.K.'s Individualized

Educational Plan ("IEP") for implementation within the District; and (7) appeals the July 11, 2018 SRO Krolak decision. On June 5, 2020, Plaintiffs filed both fully briefed motions for summary judgment, which Defendants oppose. *See* DE [104], [105]. On August 11, 2020, Judge Brown referred Plaintiffs' motions to this Court for a Report and Recommendation as to whether they should be granted. For the reasons set forth herein, the Court respectfully recommends denying both of Plaintiffs' motions for summary judgment in their entirety.

## I.    BACKGROUND

The following facts are taken from the SACC, administrative record contained in DE [43] and supporting documents. Unless otherwise noted, these facts are not in dispute. Plaintiffs have filed numerous administrative proceedings and multiple actions in this Court. In the interest of brevity, only the proceedings relevant to the issues presented in Plaintiffs' motions are discussed below.

### A.    <u>Relevant Facts and Procedural History</u>

At the time the SACC was filed, A.K. was a fifteen-year-old boy, and as set forth above, he was born with Down syndrome. SACC ¶ 2. A.K., classified as a student with an intellectual disability, attended elementary school in the Remsenburg-Speonk School District ("Remsenburg") from kindergarten through grade 2. *See* August 15, 2017 Decision of IHO Monk ("Monk Decision"), DE [43-4], at 7. A.K. was verbal and could read and decode words but had difficulty understanding them, needing substantial prompting and repetition. *See id.* He struggled with short stamina, and needed a one-to-one aide for toileting assistance, dressing with zippers

3

and buttons and holding onto crayons. *See id.* A.K. attended grades 3 and 4 in the Center Moriches School District, and returned to Remsenburg for grades 5 and 6. *See Id.* at 7-8. In grades 5 and 6, A.K. attended an integrated co-teaching class, learning with both disabled and non-disabled peers, and received the support of a one-to-one aide, as well as speech and language therapy, occupational therapy and physical therapy. *See id.* at 8.

Special education programs in Westhampton include integrated co-taught services and resource room. *See id.* For resident students for whom the District does not have an appropriate program to meet those students' needs, Westhampton often places such students in another district, a BOCES program, an approved private school, a day school program or a state operated school or residential program. *See id.*

The Parents were unwavering in their desire for A.K. to be educated within the District, but Westhampton ultimately determined that it did not have enough students to warrant creating a program to meet A.K.'s needs. *See id.* As a result, he was sent out-of-District for school. *See id.* at 2. The Parents objected to having A.K. educated full-time outside the District for the 2016-2017 and 2017-2018 school years, and filed claims for a State administrative proceeding.

In response to the Parents' objections, hearings were held by: (1) IHO Nancy Lederman ("IHO Lederman"), who issued her decision on January 26, 2017; (2) IHO Monk, who issued his decision on August 15, 2017; and (3) SRO Krolak, who issued his decision on October 18, 2017. The Parents also filed a claim for an administrative

proceeding before IHO Leah Murphy ("IHO Murphy") after the District denied their request to modify A.K.'s educational placement during the pendency of this and related proceedings.  In response to the second claim, hearings were held by:  (1) IHO Murphy, who issued an interim administrative decision on June 15, 2018; and (2) SRO Krolak, who issued his decision on July 11, 2018.

### i. January 26, 2017 Decision of IHO Lederman and Subsequent District Actions

The Parents filed a due process complaint on May 10, 2016, objecting to Westhampton's denial of in-district placement for A.K. for the 2016-2017 school year. *See* January 26, 2017 Decision of IHO Lederman ("Lederman Decision"), DE [43-14], at 1-2.  After a different IHO granted the District's motion to dismiss the due process complaint, an SRO vacated the dismissal and ordered the matter remanded to the previous IHO, unless the parties agreed to consolidation before a different IHO in a pending proceeding before Remsenburg.  *See id.* at 2.  The Parents, Westhampton and Remsenburg attended prehearing conferences on July 26, 2016 and August 4, 2016, subsequent to which the cases were consolidated, and hearings were held on August 29, 2016 and September 1, 2016.  *See id.*

IHO Lederman received a copy of the due process complaint the Parents filed against Westhampton, challenging the District's recommended placement for A.K. for the 2016-2017 school year.  *See id.*  On October 11, 2016, that matter was consolidated with the proceedings before the Westhampton and Remsenburg districts.  *See id.*

On October 14, 2016, IHO Lederman conducted an impartial hearing on Plaintiffs' due process complaint.  *See id.* at 3.  The hearing continued on October 17,

November 10 and November 14 of that year, and on November 10, 2016, the Parents withdrew all complaints against Remsenburg. *See id.* In her January 26, 2017 decision, IHO Lederman directed Westhampton to formally enroll A.K within the District and assume responsibility for convening a Committee on Special Education ("CSE") in order to provide an appropriate placement for A.K. *See* Monk Decision at 3. IHO Lederman further directed the District to retain a "qualified consultant on inclusion" to advise and report to the District on inclusion for A.K. at the middle school level. *See id.*

Westhampton retained two consultants: the District chose one consultant, Victoria Regan, and the Parents chose the other, Kathleen Feeley. *See id.* IHO Lederman charged both consultants with reviewing A.K.'s education record and examining instructional programs and curricula available in the District to assess whether supplementary aids and supports would allow him to benefit from inclusion in any classes within the District, and to make recommendations in accordance with the results of their review, and both consultants complied. *See id.* at 4. The consultants were permitted to, and did, examine instructional programs in other districts to assess whether supplementary aids and supports would allow A.K. to benefit from inclusion in available classes, and to make recommendations in accordance with their results. *See id.*

IHO Lederman instructed the District to convene a CSE to develop an IEP and provide an appropriate placement for A.K. within 10 days of receiving the consultants' reports. *See id.* at 4. IHO Lederman directed that the CSE receive and

consider the consultants' reports, as well as invite them to the CSE meeting to report orally on their findings, and include such results and recommendations of their reports on A.K.'s IEP. *See id.* Both consultants appeared at CSE meetings, but the IEP had not been finalized as of the date of the hearing before IHO Monk. *See id.* Finally, IHO Lederman concluded that, to the extent inclusion in a general education or less restrictive self-contained class is not recommended by the CSE, placement is to be in a class with students with similar needs and not in a class with "mostly non verbal students," and that if the District intends to place A.K. out-of-District, the CSE is to invite to its meeting representatives from the agency or district to discuss A.K.'s needs and how such a program will address them, memorializing such information on A.K.'s IEP. *See id.* at 4-5. None of these events occurred prior to the hearing before IHO Monk.

### ii. **August 15, 2017 Decision of IHO Monk**

In accordance with IHO Lederman's order, the CSE reconvened to review any possible in-district programs for A.K., as well as to hear both experts' recommendations and reach out to neighboring school districts to ascertain whether they could accommodate A.K.'s needs for the 2016-2017 school year. *See id.* at 3-5. On April 19, 2017, the Parents filed a due process complaint alleging that Westhampton violated A.K.'s rights under the IDEA to a free and appropriate education ("FAPE") for the 2016-2017 school year as a result of the CSE's actions and recommendations. *See* October 18, 2017 decision of SRO Krolak ("2017 Krolak

Decision"), DE [43-3], at 4.  After additional CSE meetings in May 2017, the Parents filed a second, consolidated due process complaint, adding claims that:

> [T]he CSE chairperson recommended an educational placement which she was not familiar with and that was unnecessarily restrictive, the CSE chairperson recommended that placement without exploring the possibility of implementing the student's lEP goals within the district, and the CSE was improperly composed because it failed to include a representative from the recommended placement....

*Id.* at 5.

An impartial hearing on Plaintiffs' consolidated due process complaint before IHO Monk commenced on June 15, 2017 and concluded on June 22, 2017.  At the time of the hearing before IHO Monk, the CSE's current recommendation for A.K. was placement on "Home Tutoring" with all appropriate "related services" required in his IEP provided either at home or in the District.  This placement was also identified as a "pendency placement" throughout the course of litigation.  *See* Monk Decision at 5.

IHO Monk noted that no party took exception to A.K.'s classification for the 2016-2017 and 2017-2018 school years, as all believed the classification recommendations were appropriate to address his disabilities.  Rather, the Parents contested A.K.'s placement outside of the District, and claimed that the CSE Chairperson recommended an educational placement she was not familiar with and that was inconsistent with the CSE member consensus, within a more restrictive learning environment than necessary and without exploring the possibility of implementing A.K.'s IEP goals within the District.  *See id.* at 6.  The Parents further asserted that the CSE Chairperson recommended an educational placement not attended by a representative from such location and that her integrity was

compromised by the attendance of two CSE members who should have been removed for partiality.  *See id.*

Plaintiffs urged IHO Monk to issue an order compelling Westhampton to attempt in "good faith" to implement A.K.'s IEP goals "within district," as Plaintiffs argued that in-District education would be the least restrictive learning environment ("LRE"), and that implementing A.K.'s IEP in the District was "entirely possible."  *See id.* at 6-7.  Further, the Parents alleged that without an order from IHO Monk compelling Westhampton to educate A.K. within the District, Westhampton will "continue to defy its legal obligations."  *Id.* at 7.

In upholding Westhampton's recommendation to educate A.K. out-of-District, IHO Monk reviewed the extensive administrative record before him, and reasoned that, because the parties did not disagree on the size or structure of the program for A.K., the parties did not disagree as to what constituted an LRE for A.K.  *See id.* at 11.  He analyzed the two consultants' opposing recommendations as to A.K.'s placement after their examinations.  *See id.* at 11-12.  Feeley, the Parents' consultant, concluded that A.K. would benefit from inclusion in classes within the District, with supplementary aids and supports, and would make "meaningful progress" attending school as close to home as possible.  *See id.* at 12.  Regan, Westhampton's consultant, reviewed District records as to A.K., observed him within the in-District setting where he received related services as well as during his home instruction, visited District classes, reviewed class profiles and curricular materials and visited neighboring districts to review their curricula, content and class profiles as to those

9

districts' programs.  *See id.*  Regan recommended placing A.K. in a neighboring district with a life skills program and a small class placement, thereby allowing A.K. to be in a building with typical students and in an instructional group with peers with similar needs.  *See id.*  Regan further concluded, and IHO Monk agreed, that Westhampton did not currently have available special educational classes and instructional groupings that could accommodate A.K.  *See id.*

IHO Monk ultimately concluded that Westhampton did not deny A.K. a FAPE. *See id.* at 14-16.  He noted that "[p]lacement within the district, although a legitimate concern of parents that a child attend school with other neighborhood children, has been held to be a concern beyond the educational benefit inquiry made under IDEA." *Id.* at 15.  Based on the record, IHO Monk determined that an LRE could not be implemented within a regular educational classroom for A.K.  *See id.*  Finally, IHO Monk explained, "Westhampton Beach is not required to create a program, but it is required to examine whether AK's needs can be met within a district class with supplementary aids and services.  I feel that they have taken on this examination and made a well informed determination."  *Id.* at 16.

In concluding that the District sustained its burden to demonstrate that it was prepared to provide a FAPE for the challenged school years, IHO Monk noted that A.K. would have made progress had he attended the recommended out-of-District placement, the Parents' preferred in-District placement is not the LRE, and the testimony and information in the administrative record did not demonstrate a reasonable accommodation Westhampton could have made, nor how A.K.'s academic

deficits could have been addressed in-District, as his "inability to function in a mainstream setting has been well established." *Id.* at 16. IHO Monk directed the parties to complete the placement process for 2017-2018, and the CSE to canvas out-of-District programs so as to offer A.K. an appropriate program in connection with his IEP.

### iii. October 18, 2017 Decision of SRO Krolak

Plaintiffs submitted a Request for Review on September 13, 2017, seeking SRO review of IHO Monk's decision. *See* Pl. Request for Review, DE [43-6]. Plaintiffs maintained that IHO Monk was incorrect because he misconstrued the meaning of IHO Lederman's order, specifically that IHO Lederman's order required that prior to "outsourcing" A.K.'s placement, the District must undertake a "meaningful analysis" and "good faith" attempt to implement A.K.'s IEP internally, including consideration of possible reasonable modifications, augmentation or reallocation of special education and related services resources necessary to meet the IEP goals "within district." *See* Pl. Request for Review at 2-3, ¶ 6. As such, Plaintiffs requested that an SRO reverse IHO Monk's decision and order the District to enroll A.K. within-District and within a mainstream setting, and hire a qualified individual to assist the District in this effort and a judgment for compensatory education and reimbursement of attorney fees. *See id.* at 10.

SRO Krolak reviewed Plaintiffs' appeal of the IHO Monk decision that determined that the educational program the District's CSE recommended for 2016-2017 and 2017-2018 was appropriate and sustained the appeal in part. *See* 2017

Krolak Decision. Initially, SRO Krolak deemed abandoned several issues previously asserted in Plaintiffs' due process complaint but not raised on appeal, including that Regan's report was irreconcilably compromised and substantively flawed, the CSE was improperly compromised, district counsel acted to impair the efficacy of the CSE, the CSE Chairperson recommended a placement she was not familiar with, the CSE lacked a district representative from a district that could implement it and the District harbored a systematic discriminatory policy. *See id.* at 12. As such, the sole issue on review before SRO Krolak was Plaintiffs' allegation that the District "has a duty to meaningfully analyze and make a good faith attempt to implement the student's educational goals within the district before placing the student in an out of district placement, and that the district failed to do so." *Id.*

To determine whether the District's IEP placed A.K. in the LRE, SRO Krolak utilized the Second Circuit's two-prong test set forth in *P. ex rel. Mr. & Mrs. P. v. Newington Board of Education*, 546 F.3d 111 (2d Cir. 2008). Under *Newington*, the analysis considers: (1) whether education in the general classroom, with the use of supplemental aids and services, can be achieved satisfactorily for a given student, and, if not, (2) whether the school has mainstreamed the student to the maximum extent appropriate. *See Newington*, 546 F.3d at 119-20. SRO Krolak's decision notes that a determination as to the first prong is made through an examination of a non-exhaustive list of factors, including whether the district made reasonable efforts to accommodate the child in a regular classroom; the educational benefits available to the child in a regular class with appropriate supplementary aids and services, as

12

compared to the benefits provided in a special education class; and the possible negative effects of the inclusion of the child on the education of the other students in the class. *See id.* at 120; 2017 SRO Krolak Decision at 15.

In determining whether Westhampton fulfilled the first *Newington* prong, whether A.K. can be educated satisfactorily in a general education class with supplemental aids and services, SRO Krolak reviewed A.K.'s then-present levels of performance. A.K.'s reports placed him at or below the first percentile in reading comprehension, spelling, listening comprehension and mathematics; in the low range in single-word reading and in the low average range in pseudo-word decoding; and below the first percentile in speech-language skills. *See* 2017 SRO Krolak Decision at 16. The reports noted that A.K. required prompts to regulate food intake, as well as chew and swallow in a safe and socially appropriate manner, and that he presented with decreased postural and upper extremity tone, strength and endurance, ocular motor weakness and decreased fine and gross motor skills, as well as a decreased ability to attend to gross motor activities in a large group setting. *See id.* A.K.'s IEP indicated that he enjoyed social interaction, and frequently interrupted groups of adults and children by trying to hug them or stand in front of individuals. *See id.* Finally, the IEP indicated that A.K. required an established and predictable routine and structured environment, with individualized attention to focus on tasks, as well as intensive supervision to function in the educational setting. *See id.* He required a program with a low student-to-teacher ratio with minimal distractions to make academic progress. *See id.*

SRO Krolak also reviewed both inclusion consultants' reports, as well as the information each consultant reviewed to arrive at her results and recommendations, s*ee id.* at 16-22, and determined that, given the consultants' "extensive review of the district's available services," the CSE participants had "ample" information regarding the District's resources to determine the student's LRE and whether the District could provide the student with a FAPE in a general education setting. *See id.* at 22. Further, SRO Krolak noted that the CSE participants "grappled" with the Plaintiffs' preference to educate A.K. within-District, as well as Feeley's recommendations to that effect, "at length." *See id.* The record reflects that several participants asked questions in an effort to ascertain how Feeley's recommendations could be implemented in-District. *See id.*

SRO Krolak concluded that the District made "reasonable efforts to consider accommodations for the child in a general education classroom, as well as the benefits and drawbacks of placing him in that setting, and therefore appropriately determined that the student could not be satisfactorily educated in a general classroom with the use of supplemental aids and services." *Id.* at 25-26. Moreover, SRO Krolak determined that the CSE's recommendations not only provided A.K. with a FAPE, but also constituted his LRE. *See id.* at 26.

As to the second *Newington* prong, SRO Krolak concluded that the evidence in the record demonstrated that the District attempted to provide Plaintiffs with two options for out-of-District placements because other districts indicated they were capable of implementing the special class placement recommended on the IEP when

the District determined it was not possible to implement the IEP in-District. *See id.* at 27. SRO Krolak further noted that the District utilized a reasonable procedure to locate an appropriate educational setting in a neighboring district, specifically, canvassing neighboring districts to determine whether they had an appropriate placement that could meet A.K.'s needs and offering to facilitate site visits. *See id.* SRO Krolak cited to the fact that in response, through a series of identical letters, the Parents wrote to each CSE participant on the attendance list for a CSE meeting, including A.K.'s special education teacher, school psychologist and representatives of neighboring school districts, and warned them that if they attended or participated in that meeting, they would "become entangled in outstanding State and Federal litigation." *Id.* At 28.

SRO Krolak determined that Westhampton did not deny A.K. a FAPE by recommending a special class placement and attempting to locate one in a neighboring district, but noted that the District "is not absolved of its obligation to continue to attempt to educate the student in the school he would have attended if not disabled unless the student's IEP requires some other arrangement." *See id.* As such, SRO Krolak overturned the portion of IHO Monk's order directing that when the CSE reconvenes to recommend an appropriate placement, it should not consider placement of the student within the District. *See id.* at 28-29.

### iv. **June 15, 2018 Interim Order of IHO Murphy**

On March 12, 2018, Plaintiffs commenced a second proceeding, challenging the recommendations arising out of a CSE meeting held on March 5, 2018. *See* June 15, 2018 Interim Order of IHO Murphy ("IHO Murphy Order"), DE [105-1], Exhibit ("Ex.") B. During these proceedings, the Parents requested a hearing as to A.K.'s pendency placement. *See id.* In denying the Parents' request, IHO Murphy noted that they acknowledged the agreed-upon pendency placement during pre-hearing conference calls. *See id.* at 2, 7. The Parents asked the District to allow A.K. to attend Westhampton for lunch and electives, and the District refused to amend the prior agreement as to A.K.'s placement during the pendency of all proceedings and litigation ("pendency agreement"). *See id.* at 7.

While acknowledging that A.K.'s current pendency placement is "the most restrictive and he would be better served if he had more opportunities to be educated in a school setting," IHO Murphy determined that the pendency agreement has been acknowledged before her and in previous decisions. *See id.* at 7-8. Moreover, IHO Murphy concluded that the pendency provisions of the IDEA and New York State Education law require a student to remain in the then-current educational placement until such proceedings have been completed, and that pendency placement and appropriate placement are "separate and distinct concepts." *Id.* at 9. As such, IHO Murphy found Plaintiffs' request for a hearing on the issue of pendency to be inappropriate, and therefore denied the request. *See id.* at 10.

16

### v. **July 11, 2018 Decision of SRO Krolak**

On appeal, SRO Krolak concluded that IHO Murphy correctly denied Plaintiffs' request for a change in pendency.  *See* July 11, 2018 Decision of SRO Krolak ("2018 Krolak Decision"), DE [105-1], Ex. A, at 7.   In so concluding, SRO Krolak acknowledged IHO Murphy's review of the administrative record and previous decisions involving the student, as well as her "careful[]" consideration of Plaintiffs' position, before "correctly reaching the conclusion that the student's pendency placement had been determined by agreement of the parties and acknowledged in prior proceedings." *Id.*

SRO Krolak agreed with IHO Murphy that Plaintiffs are not entitled to a change in pendency, and that their "desire to augment the student's pendency placement without the consent of the district does not constitute a pendency changing event." *Id.* Initially, SRO Krolak rejected Plaintiffs' argument that pendency should be flexible because of their perceived notion that if a state-level administrative decision, such as that issued by an SRO, agrees with a student's parents that a change in placement was appropriate, such decision will effectuate a change in pendency placement. *See id.* at 8. SRO Krolak concluded that such a decision pertains only to "overall litigation regarding tuition reimbursement." *See id.* Next, SRO Krolak rebuffed Plaintiffs' argument that pendency is flexible where the parties intended the placement to be temporary. *See id.* at 8-9. Last, he concluded that Plaintiffs' argument that a modification of pendency placement would align with the "best interests" of A.K. was unavailing, as pendency is evaluated independently from the

appropriateness of the program the CSE offered.  *See id.* at 9.  Accordingly, SRO Krolak determined that IHO Murphy correctly denied Plaintiffs' request for a change in pendency, and found that absent a pendency changing event, A.K. must remain in his pendency placement for the duration of the due process proceedings.  *See id.*

### B.    Plaintiffs' Motions for Summary Judgment

On June 5, 2020, Plaintiffs filed the instant motions for summary judgment, which Defendants oppose.  *See* DE [104], [105].  Plaintiffs argue initially that the IHO Monk and 2017 SRO Krolak opinions should be overturned as a result of errors of fact and misapplications of law, specifically their determinations that Defendants offered A.K. a FAPE as required by the IDEA and New York's Education Law.  *See* DE [104] ("Pl. LRE Br.").  In opposition, Defendants take the position that a number of Plaintiffs' arguments have been deemed abandoned or were otherwise not administratively exhausted, and that in any event, Plaintiffs have failed to meet their burden by a preponderance of the evidence that either IHO Monk or SRO Krolak erred as a matter of fact or law.  *See* DE [104-1] ("Def. LRE Opp.")

Plaintiffs' second motion for summary judgment argues that IHO Murphy and SRO Krolak erred in denying Plaintiffs' request to modify A.K.'s pendency placement, and asks this Court to overturn those decisions, or issue an order directing Westhampton to modify A.K.'s pendency placement to include his participation in a general education setting for lunch and electives until the final resolution of his appeal as required by the pendency provision of the IDEA, 20 U.S.C. § 1415(j).  *See* DE [105] ("Pl. Pendency Br.").  In opposition, Defendants argue that both IHO

Murphy and SRO Krolak denied a change in pendency placement in accordance with applicable law, and that this Court does not have authority to modify A.K.'s pendency placement.  *See* DE [105-2] ("Def. Pendency Opp.").

## II.    LEGAL STANDARD

Both motions for summary judgment concern the proper interpretation of the IDEA, 20 U.S.C. § 1400 *et seq.*, and both require the Court to address the manner in which federal courts must go about their IDEA-mandated review of state administrative decisions.

Congress enacted the IDEA "to ensure that all children with disabilities have available to them a free appropriate public education . . . designed to meet their unique needs . . . [and] to ensure that the rights of children with disabilities and parents of such children are protected."  20 U.S.C. § 1400(d)(1)(A)-(B); *see also Forest Grove Sch. Dist. v. T.A.*, 557 U.S. 230, 239, 129 S.Ct. 2484, 2491 (2009) (concluding that a court could award private school tuition reimbursement to the parents of disabled children not provided a "free appropriate public education").  "The IDEA offers federal funds to states that develop plans to assure 'all children with disabilities' [residing in each such state] a 'free appropriate public education,' 20 U.S.C. § 1412(a)(1)(A)."  *Grim v. Rhinebeck Cent. Sch. Dist.*, 346 F.3d 377, 379 (2d Cir. 2003).

"To meet [the IDEA's] requirements, a school district's program must provide 'special education and related services[,]' [20 U.S.C. § 1401(9)], tailored to meet the unique needs of a particular child, and be reasonably calculated to enable the child

to receive educational benefits." *Gagliardo v. Arlington Cent. Sch. Dist.*, 489 F.3d 105, 107 (2d Cir. 2007) (some internal quotation marks omitted); *see also Grim*, 346 F.3d at 379 (recognizing this requirement).  These services "must be administered according to an 'individualized education program' . . ., which school districts must implement each year for each student with a disability." *Grim*, 346 F.3d at 379 (quoting 20 U.S.C. § 1414(d)).

An IEP is "a written statement that 'sets out the child's present educational performance, establishes annual and short-term objectives for improvements in that performance, and describes the specially designed instruction and services that will enable the child to meet those objectives.'" *D.D. ex rel. V.D. v. N.Y.C. Bd. of Educ.*, 465 F.3d 503, 507–08 (2d Cir. 2006) (quoting *Honig v. Doe*, 484 U.S. 305, 311, 108 S.Ct. 592, 598 (1988)), *amended on other grounds*, 480 F.3d 138 (2d Cir. 2007).  Under the IDEA, for a child's IEP to be adequate, it must be "[']likely to produce progress, not regression, and [must] . . . afford[] the student with an opportunity greater than mere trivial advancement.'" *T.P. ex rel. S.P. v. Mamaroneck Union Free Sch. Dist.*, 554 F.3d 247, 254 (2d Cir. 2009) (quoting *Cerra v. Pawling Cent. Sch. Dist.*, 427 F.3d 186, 195 (2d Cir. 2005)).  However, it need "not . . . furnish every special service necessary to maximize each handicapped child's potential." *Grim*, 346 F.3d at 379 (quoting *Bd. of Educ. v. Rowley*, 458 U.S. 176, 199, 102 S.Ct. 3034, 3048 (1982)) (brackets, ellipsis, and internal quotation marks omitted).  Under an IEP, "education [must] be provided in the 'least restrictive setting consistent with a child's needs.'" *Id.* (quoting *Walczak v. Fla. Union Free Sch. Dist.*, 142 F.3d 119, 122 (2d Cir. 1998)).

The IEP is "[t]he centerpiece of the IDEA's educational delivery system." *D.D. ex rel. V.D.*, 465 F.3d at 507 (internal quotation marks omitted).

"Since New York State receives federal funds under IDEA, it is obliged to comply with the requirements of this law. To meet these obligations and to implement its own policies regarding the education of disabled children, the State has assigned responsibility for developing appropriate IEPs to local Committees on Special Education [], the members of which are appointed by school boards or the trustees of school districts." *Walczak*, 142 F.3d at 123 (citing N.Y. Educ. Law § 4402(1)(b)(1)). "In developing a particular child's IEP, a CSE is required to consider four factors: (1) academic achievement and learning characteristics, (2) social development, (3) physical development, and (4) managerial or behavioral needs." *Gagliardo*, 489 F.3d at 107–08 (citing 8 NYCCRR § 200.1(ww)(3)(i)). "[T]he CSE must also be mindful of the IDEA's strong preference for 'mainstreaming,' or educating children with disabilities '[t]o the maximum extent appropriate' alongside their non-disabled peers." *Id.* at 108 (citing 20 U.S.C. § 1412(a)(5)) (second set of brackets in original).

If a New York parent "believe[s] an IEP is insufficient under the IDEA," he or she "may challenge it in an 'impartial due process hearing,' 20 U.S.C. § 1415(f), before an [Impartial Hearing Officer, or 'IHO'] appointed by the local board of education." *Grim*, 346 F.3d at 379 (quoting N.Y. Educ. Law § 4404(1)). At the hearing before the IHO, "the school district has the burden of demonstrating the appropriateness of its proposed IEP." *Id.* As the governing New York State statute explains:

>The board of education or trustees of the school district or the state agency responsible for providing education to students with disabilities shall have the burden of proof, including the burden of persuasion and burden of production, in any such impartial hearing, except that a parent or person in parental relation seeking tuition reimbursement for a unilateral parental placement shall have the burden of persuasion and burden of production on the appropriateness of such placement.

N.Y. Educ. Law § 4404(1)(c).

An IHO's decision may, in turn, be appealed to a State Review Officer, who is an officer of the State's Department of Education. *Grim*, 346 F.3d at 379–80. Generally, either "party aggrieved" by the findings of the SRO "shall have the right to bring a civil action" in either state or federal court. 20 U.S.C. § 1415(i)(2)(A). When such an action is brought in federal district court, the court reviews the records of all of the prior administrative hearings and must hear additional evidence if so requested by either of the parties. *Id.* at § 1415(i)(2)(c).

"[The federal court] standard for reviewing a state's administrative decisions in IDEA cases is . . . well established." *T.Y. v. N.Y.C. Dep't of Educ.*, 584 F.3d 412, 417 (2d Cir. 2009), *cert denied*, 560 U.S. 904, 130 S.Ct. 3277 (2010). "The responsibility for determining whether a challenged IEP will provide a child with an appropriate public education rests in the first instance with administrative hearing and review officers. Their rulings are then subject to 'independent' judicial review." *Walczak*, 142 F.3d at 129. Nonetheless, "the role of the federal courts in reviewing state educational decisions under the IDEA is 'circumscribed.'" *Gagliardo*, 489 F.3d at 112; *see also Grim*, 346 F.3d at 380–81 (interpreting the IDEA as "strictly limiting judicial review of state administrative decisions"). A reviewing court "must engage

in an independent review of the administrative record and make a determination based on a 'preponderance of the evidence.'" *Gagliardo*, 489 F.3d at 112; *see also Rowley*, 458 U.S. at 206, 102 S.Ct. at 3051.  But such review "is by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review." *Rowley*, 458 U.S. at 206, 102 S.Ct. at 3051.

"To the contrary, federal courts reviewing administrative decisions must give 'due weight' to these proceedings, mindful that the judiciary generally 'lacks the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy.'" *Gagliardo*, 489 F.3d at 113 (quoting *Rowley*, 458 U.S. at 206, 208, 102 S.Ct. at 3034) (brackets omitted); *see also Walczak*, 142 F.3d at 129 ("While federal courts do not simply rubber stamp administrative decisions, they are expected to give 'due weight' to these proceedings....") (citation omitted).  District courts are not to make "subjective credibility assessment[s]," and cannot "ch[oose] between the views of conflicting experts on . . . controversial issue[s] of educational policy . . . in direct contradiction of the opinions of state administrative officers who had heard the same evidence." *Grim*, 346 F.3d at 383.  As the Supreme Court has said, "once a court determines that the requirements of the Act have been met, questions of methodology are for resolution by the States." *Rowley*, 458 U.S. at 208, 102 S.Ct. at 3052.

Accordingly, courts generally "defer to the final decision of the state authorities, even where the reviewing authority disagrees with the hearing officer."

*A.C. ex rel. M.C. v. Bd. of Educ. of the Chappaqua Cent. Sch. Dist.*, 553 F.3d 165, 171 (2d Cir. 2009) (quoting *Karl ex rel. Karl v. Bd. of Educ. of Geneseo Cent. Sch. Dist.*, 736 F.2d 873, 877 (2d Cir. 1984)) (internal quotation marks omitted). "If the SRO's decision conflicts with the earlier decision of the IHO, the IHO's decision may be afforded diminished weight." *A.C.*, 553 F.3d at 171 (internal quotation marks omitted); *see also Gagliardo*, 489 F.3d at 113 n. 2 (same). "Deference is particularly appropriate when . . . the state hearing officers' review has been thorough and careful." *Walczak*, 142 F.3d at 129. Nevertheless, the SRO's or IHO's factual findings must be "reasoned and supported by the record" to warrant deference. *Gagliardo*, 489 F.3d at 114.

IDEA actions in federal court are appropriately resolved by examination of the administrative record in a summary judgment posture. *See J.R. v. Bd. of Educ. of City of Rye Sch. Dist.*, 345 F. Supp. 2d 386, 394 (S.D.N.Y. 2004). In this context, however, the existence of disputed issues of material fact will not defeat summary judgment. Rather, "[f]ederal courts reviewing administrative determinations under the IDEA must base their decisions on 'the preponderance of the evidence,' taking into account not only the record from the administrative proceedings, but also any further evidence presented before the District Court by the parties." *Grim*, 346 F.3d at 380 (citing 20 U.S.C. § 1415(i)(2)(B)). The court's review "requires a more critical appraisal of the agency determination than clear-error review but falls well short of complete *de novo* review." *L.O. ex rel. K.T. v. N.Y.C. Dep't of Educ.*, 822 F.3d 95, 108 (2d Cir. 2016) (internal quotation marks omitted).

The district court's inquiry is two-fold: "First, has the State complied with the procedures set forth in the Act? And second, is the individualized educational program developed through the Act's procedures reasonably calculated to enable the child to receive educational benefits?" *Rowley*, 458 U.S. at 206-07, 102 S.Ct. at 3051. (footnote omitted); *see also Grim*, 346 F.3d at 381. It is the burden of the school districts to prove by a preponderance of evidence that the answer to both questions is yes. *See J.R.*, 345 F.Supp.2d at 395.

It is with these standards in mind that the Court addresses Plaintiffs' motions.

## III.    DISCUSSION

### A.    <u>Subject Matter Jurisdiction</u>

As a threshold matter, Defendants argue that this Court does not have subject matter jurisdiction over a number of Plaintiffs' arguments due to their failure to exhaust the administrative remedies available to them. *See* Defs. LRE Opp. at 27-67. Specifically, Defendants argue that Plaintiffs cannot raise issues in their motion for summary judgment that they did not raise in their Request for Review to SRO Krolak. *See id.* at 30-67. Here, the SRO ruled that the Parents had abandoned on appeal, pursuant to 8 N.Y.C.R.R. §§ 279.8(c)(2) and (4), issues including claims that Regan's report was irreconcilably compromised and substantively flawed, that the CSE was improperly compromised, that District counsel acted to impair the efficacy of the CSE, that the CSE Chairperson's recommendation was inconsistent with the CSE consensus, that the CSE Chairperson recommended a placement she was not familiar with, that the CSE lacked a district representative from a district that could

implement it and that the District harbored a systematic discriminatory policy. *See* 2017 Krolak Decision at 12.

Similarly, SRO Krolak concluded, pursuant to 34 C.F.R. §300.514(a) and 8 N.Y.C.R.R. §200.5(j)(5)(v), that certain unappealed determinations were final and binding on the parties and would not be reviewed on administrative appeal, except to the extent such issues were related to the main issues on appeal. Such determinations included IHO Monk's finding that the Parents agreed with the evaluations and goals on the District IEPs, that the parties agreed on the size and structure of the program for A.K. and that the Parents' warning to the CSE members prior to the June 2017 CSE meeting resulted in participants refusing to attend and prevented the CSE from finalizing A.K.'s IEP for 2017-2018. *See id.* Based on these conclusions, Defendants assert that the only surviving claim relates to whether IHO Monk failed to apply the correct standard for the LRE, such that the District's placement decision was a predetermination of A.K.'s educational placement in violation of applicable laws. *See* Defs. LRE Opp. at 32-34.

The IDEA statute provides parents with the following rights with respect to any impartial hearing concerning the identification, evaluation or educational placement of a child with disabilities: (1) to "be accompanied and advised by counsel and by individuals with special knowledge or training with respect to the problems of children with disabilities," 20 U.S.C. § 1415(h)(1); (2) to "present evidence and confront, cross-examine, and compel the attendance of witnesses," 20 U.S.C. §

1415(h)(2); and (3) to have a hearing record and to receive written findings of fact and a decision. *See* 20 U.S.C. § 1415(h)(3), (4).

A parent "aggrieved" by an IHO decision may appeal to a second administrative level if available. *See* 20 U.S.C. § 1415(h). An "IHO's decision is 'binding' upon the parties absent an appeal to the SRO." *D.N. v. N.Y.C. Dep't of Educ.*, 905 F. Supp. 2d 582, 587 (S.D.N.Y. 2012) (quoting 8 NYCCR § 200.5(j)(5)(v)). "[I]ssues that were decided by the IHO and not appealed or cross-appealed by the party against which they were decided are binding against that party, and on the SRO and th[e] [c]ourt, as to that party." *C.H. v. Goshen Cent. Sch. Dist.*, No. 11–CV–6933 (CS), 2013 WL 1285387, at *9 (S.D.N.Y. Mar. 28, 2013).

Upon exhaustion of administrative review, an appeal may be made to a state or federal court. 20 U.S.C. § 1415(i)(2)(A). Failure to exhaust administrative remedies under the IDEA prior to making such an appeal deprives a court of subject matter jurisdiction. *See Polera v. Board of Educ. of Newburgh Enlarged City School Dist.*, 288 F.3d 478, 483 (2d Cir. 2002); *G.S. v. Pleasantville Union Free Sch. Dist.*, No. 19-CV-6508 (CS), 2020 WL 4586895, at *10, 16 (S.D.N.Y. Aug. 10, 2020); *Does v. Mills*, No. 04 CIV. 2919 (RWS), 2005 WL 900620, at *2 (S.D.N.Y. Apr. 18, 2005).

In their Request for Review to the State Review Officer, Plaintiffs raise as error only the fact that IHO Monk failed to apply the correct standard for LRE, because LRE analysis requires the District to "meaningfully consider potential reasonable modification, augmentation or reallocation of its special education and related services resources in order to satisfy the petitioner's unique and individualized IEP

27

goals internally," but IHO Monk "utilized the outdated legal standard of whether the respondent district's actions were 'reasonably calculated' to facilitate a FAPE." Pl. Request for Review at 2-4, ¶¶ 6, 10. In essence, Plaintiffs' Request for Review states that a district must undertake a "meaningful" analysis in an attempt to educate a student in-district prior to "outsourcing" that student, and that without such analysis, a student's FAPE rights are violated. *See id.* at 4-5, ¶ 12. In this regard, Plaintiffs argue that the District was compelled to undertake a "good faith attempt" to implement A.K.'s IEP within the District, and that IHO Monk erred in determining that the District could meet its burden by locating alternate placement out-of-District. *See id.* at 7, ¶ 16. Accordingly, because the other issues identified above were not brought before the SRO, the Court finds that SRO Krolak did not err in concluding that these claims were abandoned. As a result, this Court has jurisdiction only over whether IHO Monk erred in failing to consider in-District placement, and whether he properly applied the relevant law relating to the LRE.

### B.     The IHO Monk and 2017 SRO Krolak Decisions

Initially, with respect to Plaintiffs' claims that the IHO Monk and 2017 SRO Krolak decisions should be overturned, Plaintiffs move for summary judgment on the grounds that both decisions erred in determining that Defendants did not violate A.K.'s IDEA-based rights for the 2016-2017 and 2017-2018 school years. Specifically, Plaintiffs argue that both IHO Monk and SRO Krolak erred in finding that the CSE undertook meaningful analysis to comply with IHO Lederman's order, and therefore

provided A.K. with a FAPE, and that both decisions misapply the law relating to LRE, in particular the Second Circuit's two-prong test set forth in *Newington*.

A school district has met its obligation to provide a FAPE when (a) the district complies with the procedural requirements of the IDEA, and (b) the IEP developed by the district is reasonably calculated to enable the student to receive educational benefits. *See Grim*, 346 F.3d at 381. The law expresses a strong preference for children with disabilities to be educated in an integrated setting with their non-disabled peers, to the extent that integration is appropriate. *See Walczak*, 142 F.3d at 122 (citation omitted). To that end, special education and related services must be provided in the "least restrictive environment" that is consistent with a child's needs. *See id.* A child should be segregated only "when the nature or severity" of a child's disability is such "that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily." *See id.*

"[D]etermining whether a student has been placed in the 'least restrictive environment' requires a flexible, fact-specific analysis." *Newington*, 546 F.3d at 113. "Pursuant to that test, a court should consider, first, 'whether education in the regular classroom, with the use of supplemental aids and services, can be achieved satisfactorily for a given child,' and, if not, then 'whether the school has mainstreamed the child to the maximum extent appropriate.'" *Id.* at 120. The LRE requirement "is not absolute," however, and "does not require a school district to place a student in the single least restrictive environment in which he is capable of any satisfactory learning." *T.M. ex rel. A.M. v. Cornwall Cent. Sch. Dist.*, 752 F.3d 145,

162 (2d Cir. 2014).  This is because "the presumption in favor of mainstreaming must be weighed against the importance of providing an appropriate education to handicapped students." *Newington*, 546 F.3d at 119.  Thus, "the IDEA contemplates that the [Department of Education] will consider a continuum of related services and options that will be a 'best fit' for the student in question," and achieve an "optimal result across the two requirements." *M.W. ex rel. S.W. v. N.Y.C. Dep't of Educ.*, 725 F.3d 131, 145-46 (2d Cir. 2013).  Importantly, a school district "cannot avoid the LRE requirement just by deciding not to operate certain types of educational environments; instead, it must provide a continuum of alternative placements that meet the needs of the disabled children that it serves." *T.M. ex rel. A.M.*, 752 F.3d at 165; *see also F. v. City Sch. Dist. of the City of New York*, No. 15 CIV. 1448 (ER), 2016 WL 1274579, at *11 (S.D.N.Y. Mar. 31, 2016).

Each year, a school official qualified in special education, the child's teacher, the child's parents and, where appropriate, the child, should participate in the development of an IEP.  *See* 20 U.S.C. § 1414.  "The regulations governing parental participation provide that '[e]ach public agency shall take steps to ensure that one or both of the parents of a child with a disability are present at each IEP meeting or are afforded the opportunity to participate.'" *Cerra*, 427 F.3d at 192-93 (quoting 34 C.F.R. § 300.345(a)) (alteration in original).  "[T]he importance Congress attached to [this and other] procedural safeguards cannot be gainsaid." *Rowley*, 458 U.S. at 205, 102 S.Ct at 3050.  Accordingly, "[p]redetermination of a child's IEP amounts to a procedural violation of the [IDEA] if it deprives the student's parents of meaningful

participation in the IEP process." *B.K. v. N.Y.C. Dep't of Educ.*, 12 F. Supp. 3d 343, 358 (E.D.N.Y. 2014) (collecting cases); *see J.G. ex rel. N.G. v. Kiryas Joel Union Free Sch. Dist.*, 777 F. Supp. 2d 606, 648 (S.D.N.Y. 2011) ("Predetermination by a CSE of a child's IEP amounts to a procedural violation of the IDEA.") (internal quotation marks omitted). Courts, however, "regularly reject claims of predetermination where the record reflects active and meaningful participation by the student's parents in the formulation of the IEP." *B.K.*, 12 F. Supp. 3d at 358 (collecting cases).

The IEP should articulate the particular needs of the disabled child as well as the services required to meet those needs. *See* 20 U.S.C. § 1414. Specifically, an IEP must state: (1) the child's present level of educational performance; (2) the annual goals for the child, including short-term instructional objectives; (3) the specific educational services to be provided to the child, and the extent to which the child will be able to participate in regular educational programs; (4) the transition services needed for a child as he or she begins to leave a school setting; (5) the projected initiation date and duration for proposed services; and (6) objective criteria and evaluation procedures and schedules for determining, on at least an annual basis, whether instructional objectives are being achieved. *See* 20 U.S.C. § 1414.

As set forth above, "[i]n addition to providing an education that is likely to produce progress and tailored to the unique needs of the child, the program must be offered in the least restrictive environment." *Avaras ex rel. A.A. v. Clarkstown Cent. Sch. Dist.*, No. 18-CV-6964, 2019 WL 4600870, at *2 (S.D.N.Y. Sept. 21, 2019) (citing 20 U.S.C. § 1412(a)(5)(A)). "[A] disabled student's least restrictive environment refers

to the least restrictive educational setting consistent with that student's needs, not the least restrictive setting that the school district chooses to make available." *T.M. ex rel. A.M.*, 752 F.3d at 163. "This requirement expresses a strong preference for children with disabilities to be educated, to the maximum extent appropriate, together with their non-disabled peers." *Id.* at 161 (internal quotation marks omitted). Under the New York regulations, "[t]he placement of an individual student with a disability in the least restrictive environment shall: (1) provide the special education needed by the student; (2) provide for education of the student to the maximum extent appropriate to the needs of the student with other students who do not have disabilities; and (3) be as close as possible to the student's home." 8 N.Y.C.R.R. § 200.1(cc).

New York further requires that an IEP identify the child's specific class placement. *See* 8 N.Y.C.R.R. § 200.4(d)(2)(ix). In order to be grouped together in the same class, students must have sufficiently similar academic levels and learning characteristics so that each child will have the opportunity to achieve his or her annual goals. *See* 8 N.Y.C.R.R. § 200.6(a)(3)(i). Students may be grouped together in a special education class if they have the same disabilities or if they have differing disabilities but "similar individual needs for the purpose of being provided specially designed instruction." 8 N.Y.C.R.R. § 200.1(jj); *see also* 8 N.Y.C.R.R. § 200.6(h)(iv)(3). It is the responsibility of the CSE to assure that the "social interaction within the group is beneficial to each student, contributes to each student's social growth and maturity, and does not consistently interfere with the instruction being provided." 8

N.Y.C.R.R. § 200.6(a)(3)(ii).  The New York regulation cautions that the "social needs of a student shall not be the sole determinant" of his or her class placement, and that the CSE must also consider the management needs of the students in a class so that no student unduly interferes with others' ability to learn.   8 N.Y.C.R.R. § 200.6(a)(3)(ii); *see also* 8 N.Y.C.R.R. § 200.6(a)(3)(iv).   Children whose disabilities present particular management concerns should be placed in smaller-than-average size classes, depending on the degree of intervention required.  *See* 8 N.Y.C.R.R. § 200.6(h)(iv).

While the IDEA expresses a preference for educating students in the regular education classroom, a child may be removed from the regular education environment "'when the nature or severity of the handicap is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily[.]'" *Briggs v. Board of Educ.*, 882 F.2d 688, 691 (2d Cir. 1989); *see also J.G. ex rel. N.G.*, 777 F. Supp. 2d at 637–40.  When determining whether a student can be satisfactorily educated in the regular setting with supplemental aids and services, the following factors should be considered:  "(1) whether the school district has made reasonable efforts to accommodate the child in a regular classroom; (2) the educational benefits available to the child in a regular class, with appropriate supplementary aids and services, as compared to the benefits provided in a special education class; and (3) the possible negative effects of the inclusion of the child on the education of the other students in the class." *Newington*, 546 F.3d at 120.  "If the school has given no serious consideration to including the child in a regular class with such supplementary aids

and services and to modifying the regular curriculum to accommodate the child, then it has most likely violated the Act's mainstreaming directive." *Oberti by Oberti v. Bd. of Educ. of Borough of Clementon Sch. Dist.*, 995 F.2d 1204, 1216 (3d Cir. 1993)

In contrast, if "an individualized and fact-specific inquiry into the nature of the student's condition and the school's particular efforts to accommodate it" suggests the district was justified in placing the child in a special-education classroom, then the court must consider the second part of the mainstreaming test. *Newington*, 546 F.3d at 120. In this regard, courts should evaluate whether the child has been included in school programs—including non-academic components of the school day like lunch and recess—alongside children without disabilities to the maximum extent appropriate. *See id.* A court's review, while deferential to the state authorities charged with designing and implementing educational policy, "must be searching" to ensure that the IDEA's maximizing goal of mainstreaming a child with disabilities, where appropriate, is met. *Id.* at 120–21. The analysis as to whether a school district has mainstreamed a student to the maximum extent appropriate is a fact-specific inquiry, and requires a careful examination of the nature and severity of the child's handicapping condition, his or her needs and abilities, and the school district's response to the child's needs. *See id.*; *see also Daniel R.R. v. State Bd. of Educ.*, 874 F.2d 1036, 1043-45 (5th Cir. 1989). The Fifth Circuit in *Daniel R.R.* cautioned:

 [T]he Act does not require regular education instructors to devote all or most of their time to one handicapped child or to modify the regular education program beyond recognition. If a regular education instructor must devote all of her time to one handicapped child, she will be acting as a special education teacher in a regular education classroom. Moreover, she will be focusing her attentions on one child to the detriment of her entire class, including, perhaps,

34

other, equally deserving, handicapped children who also may require extra attention. Likewise, mainstreaming would be pointless if we forced instructors to modify the regular education curriculum to the extent that the handicapped child is not required to learn any of the skills normally taught in regular education. The child would be receiving special education instruction in the regular education classroom; the only advantage to such an arrangement would be that the child is sitting next to a nonhandicapped student.

*Id.* at 1048–49.

As a threshold matter, the issue of predetermination is not a matter requiring educational expertise. In other words, one need not have a background in education or educational policy to consider and determine whether the CSE had an open mind going into the 2016 and 2017 meetings. Thus, a lesser degree of deference is owed to the SRO on this issue than is due on a more squarely educational issue, such as whether a FAPE is substantively appropriate. *See R.E. v. New York City Dep't of Educ.*, 694 F.3d 167, 189 (2d Cir. 2012); *see also P.F. v. Bd. of Educ. of the Bedford Cent. Sch. Dist.*, No. 15-CV-507, 2016 WL 1181712, at *6 (S.D.N.Y. Mar. 25, 2016) ("Less deference is warranted in appeals involving an IEP's procedural validity ....").

The Court agrees with IHO Monk and SRO Krolak's thorough analyses of the CSE meetings, which note that the CSE provided the Parents with a meaningful opportunity to participate. *J.G. ex rel. N.G.*, 777 F. Supp. 2d at 648 (collecting cases) ("Courts have rejected predetermination claims where the parents actively and meaningfully participated in the development of the IEP" and "where there was credible evidence that the school district was open-minded at the IEP meeting."). Here, the District reviewed and considered both the Regan and Feeley reports, and reviewed the questions CSE members asked both consultants at the CSE meetings.

Further, IHO Monk and SRO Krolak acknowledged that a number of CSE members tried to ascertain a way in which Feeley's plan to educate A.K. in-District could feasibly succeed. Both decisions note that the Parents not only had the opportunity to, and did, attend these meetings, but it was *the Parents* who attempted to keep the CSE members from attending with the threat of litigation. The CSE members heard from a number of witnesses, as well as the Parents when they chose to attend. Taking these facts together, the Court finds that neither IHO Monk nor SRO Krolak erred in failing to find any evidence of predetermination on the part of Westhampton to educate A.K. out-of-District. *See J.P. ex rel. J.P v. City of N.Y. Dep't of Educ.*, 717 F. App'x 30, 32 (2d Cir. 2017) (summary order) (no predetermination where "CSE heard [parents'] objections, considered materials they submitted, and convened a second meeting to address their objections and explain its reasoning, and that [student's] parents fully participated in both CSE meetings"); *T.P. ex rel S.P.*, 554 F.3d at 253 (parents "meaningfully participated" in CSE meeting where CSE adopted "the parents' recommendations that [district] staff observe [student] over the summer and meet with his home providers, and that [district] staff receive training on how to educate [student]," but denied request to have an entirely different special education program); *M.B. v. New York City Dep't of Educ.*, No. 14 CV 3455-LTS, 2017 WL 384352, at *7 (S.D.N.Y. Jan. 25, 2017) (no predetermination where "CSE reviewed the evaluative input of the [private] School and . . . re-evaluation of [student] was undertaken because the parents had requested placement in the more restrictive setting of the [private] School"); *M.M. ex rel. A.M. v. N.Y.C. Dep't of Educ. Region 9*

(*Dist. 2*), 583 F. Supp. 2d 498, 507 (S.D.N.Y. 2008) (no predetermination where, among other things, "the IEP incorporated evaluations of the Student conducted by professionals of the Plaintiffs' choosing and the goals those professionals recommended"). While the Parents' frustration at the District's denial of their specific wishes for A.K.'s education is understandable, "[t]he mere fact that the CSE's ultimate recommendation deviated from their express request . . . does not render the Parents 'passive observers' or evidence any predetermination on the part of the CSE." *B.K.*, 12 F. Supp. 3d at 359. Moreover, "[w]hat the [IDEA] guarantees is an appropriate education, not one that provides everything that might be thought desirable by loving parents." *Walczak*, 142 F.3d at 132 (internal quotation marks omitted); *see also G.S.*, 2020 WL 4586895, at *12–15.

The Court disagrees with the Parents with respect to the IHO and SRO decisions. Here, the SRO decision, agreeing with both IHO Lederman and IHO Monk's decisions that the District's proposed placement provided A.K. a FAPE in the LRE is entitled to deference. It is well-reasoned, based on substantially greater familiarity with the evidence and the witnesses than this Court, grounded in thorough and logical reasoning, based on the same evidence presently before the Court, and concerns the substantive adequacy of the proposed placement to satisfy A.K.'s IEPs. Moreover, the decisions grappled with contrary evidence to the final determination and testimony from the Parents, consultants and other witnesses. Indeed, a full reading of the SRO's decision indicates the SRO repeatedly considered the Parents' arguments along with the record. The SRO's decision reflects a

comprehensive review of the record and articulates clear explanations for each conclusion.  It parses the parties' arguments in great detail and contains ample citations to the record in support of each finding.  The SRO addressed the student's educational needs and whether they could be addressed in-district.

Moreover, the IHO and SRO decisions are supported by a preponderance of the evidence.  The SRO exhaustively recounted A.K.'s then-present educational progress and capabilities, as well as testimony and reports from the inclusion experts, CSE members and others who were in regular contact with A.K. to conclude that the CSE meaningfully analyzed and rightfully decided that the District provided A.K. with a FAPE in the LRE.  *See* 2017 SRO Krolak Decision at 15-29.

The CSE members had more than sufficient information regarding Westhampton's resources to determine A.K.'s LRE and whether the District could provide A.K. with a FAPE in a general education setting, pursuant to the first prong of the *Newington* test.  The ultimate determination that it could not is well-supported by the extensive administrative record.  A.K.'s IEP and education reports clearly showed him to be at or below average, or in the lowest percentiles, in a number of curricula subjects and physical abilities.  *See* DE [43-20], Ex. O; [43-22], Exs. T, U; 2017 SRO Krolak Decision at 15-16.  Further, the two inclusion consultants' reports, relied upon by the CSE Members, IHO Murphy and SRO Krolak, specifically assessed whether supplementary aids and supports would allow A.K. to benefit from inclusion in classes in the District, as well as examined programs in other districts to determine whether supplementary aids and supports would allow A.K. to benefit from inclusion

in those districts.  The consultants each produced a report, and presented their findings to the CSE.  *See* DE [43-14], Ex. J; [43-15], Ex. L; [43-16], Ex. M; [43-17], Ex. M; 2017 SRO Krolak Decision at 16-22.  After reviewing A.K.'s then-current educational abilities and progress, as well as the capabilities of Westhampton and other districts, Regan concluded that, absent a change in special education classes and educational groupings currently available at Westhampton, the CSE should consider placing A.K. in a neighboring district with a life skills program with smaller class sizes.  *See* DE [43-14], Ex. J; 2017 SRO Krolak Decision at 16-19.  After similar analyses, Feeley recommended placing A.K. in existing classes in-District with a modified curriculum, accommodations and supplemental supports and services.  *See* DE [43-15], Ex. L; [43-16], Ex. M; [43-17], Ex. M; 2017 SRO Krolak Decision at 19-22.

As SRO Krolak notes, the CSE members conducted a discussion to ascertain which program would best meet A.K.'s needs, including how and where instruction would take place, as well as possible program options including consultant teacher services, resource room, one-to-one instruction, special classes and general education classes.  *See* DE [43-16], Ex. M; [43-17], Ex. M; 2017 SRO Krolak Decision at 22.  SRO Krolak did not err in concluding that the CSE members had ample information regarding the District's resources to determine A.K.'s LRE and whether Westhampton could provide him with a FAPE in a general education setting.  *See* 2017 SRO Krolak Decision at 22-23.  CSE members inquired as to how the District could implement Feeley's recommended in-District program, and the members heard from other witnesses, including A.K.'s physical therapist, and discussed A.K.'s then-present

levels of performance, goals, related services, supplementary aids and services and extended school year services, as well as various options for the best educational program for A.K. *See* DE [43-15], Ex. M; [43-16], Ex. M; [43-18], Ex. N; [43-19], Ex. N; 2017 SRO Krolak Decision at 22-26. After several meetings and efforts to assess the District's ability to meet A.K.'s needs in the District, the CSE determined they could not implement A.K.'s IEP in a general educational setting.

Plaintiffs are incorrect that *Newington* requires the District to make a "good faith attempt" to implement a student's educational goals in-district before placing the student in an out-of-district placement. *Newington* recognizes the IDEA's goal of including students in the regular classroom as much as is practicable, but notes that "schools must attempt to achieve that goal in light of the equally important objective of providing an education appropriately tailored to each student's particular needs." *Newington*, 546 F.3d at 122 (citation omitted). As such, the District made reasonable efforts to attempt to educate A.K. in a general educational classroom, while considering the benefits and negative consequences of such a program, and acted appropriately in determining that he could not be satisfactorily educated in a general classroom with the use of supplemental aids and services.

As to the second prong of the *Newington* test, as SRO Krolak concluded, the District utilized a reasonable procedure to locate an appropriate educational setting for A.K. in a neighboring district. *See* 2017 Krolak Decision at 26-29. The District canvassed several neighboring districts to determine whether they had an appropriate placement for A.K., and, upon hearing back from some districts, offered

to facilitate site visits.  *See* DE [43-22], Ex. DD.  In response, the Parents wrote letters to the CSE members threatening them with legal action if they attended further CSE meetings the Parents believed to be illegally convened, leading to the absence of some members and thereby preventing the District from finalizing A.K.'s placement for 2017-2018.  *See* DE [43-22], Exs. X, Y, Z, AA.

The CSE thoroughly reviewed all available evaluations, records, consultant reports and the input of CSE meeting participants to determine that A.K.'s needs could not be met in-District, and in turn provided the Parents with options that provided A.K. with a FAPE in neighboring districts.  Therefore, IHO Monk and SRO Krolak did not err in concluding that the District provided A.K. with a FAPE in the LRE in either school year, and the Plaintiffs' motion for summary judgment on this issue should be denied.

C.    **The IHO Murphy and 2018 SRO Krolak Decisions**

The Court next turns to Plaintiffs' motion for summary judgment seeking reversal of the IHO Murphy and 2018 SRO Krolak decisions upholding the denial of their request for pendency modification.  Initially, Plaintiffs argue that neither decision warrants deference.  *See* Pl. Pendency Br. at 2.  They further take the position that the LRE is a factor to consider when analyzing a pendency modification request, and that modifying A.K.'s pendency placement to include lunch and electives in-District is consistent with the LRE.  *See id.* at 6-9.

The IDEA requires that a student remain in his or her "then-current educational placement," unless the school and parents otherwise agree, during the

41

pendency of an impartial hearing and any subsequent appeals.  20 U.S.C. § 1415(j).

"Section 1415(j) represents Congress's policy choice that all handicapped children,

regardless of whether their case is meritorious or not, are to remain in their current

educational placement until the dispute with regard to their placement is ultimately

resolved." *Mackey ex rel. Thomas M. v. Bd. of Educ. for Arlington Sch. Dist.*, 386 F.3d

158, 160-61 (2d Cir. 2004) (brackets and internal quotation marks omitted).  The

"current" program has been understood as that "described in the child's most recently

implemented IEP."  *Id.* at 163.  The relevant "placement" has been interpreted to

mean the "same general level and type of services . . . [or] type of educational

program" described in the last IEP, not the right to placement at a particular school.

*T.M. ex rel. A.M.*, 752 F.3d at 171 (internal quotation marks omitted).  As such, if a

child is transferred from one school to another, but "remain[s] in the same

classification, the same school district, and the same type of educational program

special classes," the child's educational placement has not changed.  *See Concerned*

*Parents & Citizens for Continuing Educ. at Malcolm X (PS 79) v. N.Y.C. Dep't of*

*Educ.*, 629 F.2d 751, 756 (2d Cir. 1980) (finding no change in educational placement

where disabled students were transferred from one substantially similar school to

another); *see also G.R. ex Rel. B.S. v. N.Y.C. Dep't of Educ.*, No. 12 Civ. 441 (RJS),

2012 WL 310947, at *6 (S.D.N.Y. Jan. 31, 2012) ("[A]lthough the IDEA does require

that a student shall remain in his or her 'then-current educational placement' while

administrative proceedings are pending . . . this pendency provision does not require

that [the student] remain at a specific brick-and-mortar school.").  However, any

pendency placement will be superseded if there is an agreement between the parties on placement during the course of a proceeding, whether or not it is reduced to a new IEP. *Bd. of Educ. of Pawling Cent. Sch. Dist. v. Schutz*, 137 F. Supp. 2d 83 (N.D.N.Y. 2001), *aff'd*, 290 F.3d 476, 484 (2d Cir. 2002), *cert. denied*, 537 U.S. 1227 (2003). The Supreme Court has recognized that the language of the pendency provision is "unequivocal" and "means what it says." *Honig*, 484 U.S. at 323, 325, 108 S.Ct. at 604-05. Thus, the "provision is, in effect, an automatic preliminary injunction," and should be applied without regard to such factors as irreparable harm, likelihood of success on the merits, and balancing of the hardships. *Zvi D. v. Ambach*, 694 F .2d 904, 906 (2d Cir. 1982).

"[P]endency placement and appropriate placement are separate and distinct concepts." *Board of Educ. v. O'Shea*, 353 F.Supp.2d 449, 459 (S.D.N.Y.2005). Once a student's pendency placement has been established, it can be changed in one of four ways: (1) by an agreement by the parties, 20 U.S.C. § 1415(j); (2) by an unappealed administrative decision, 34 C.F.R. § 300.514(a); (3) by an SRO decision that "agrees with the child's parents that a change of placement is appropriate," 34 C.F.R. § 300.518(d); or (4) by a court determination on an appeal from an SRO decision. *Schutz*, 290 F.3d at 484. If, for example, private school placement funded by the school district is the pendency placement, then the school district must continue to pay for that placement for the duration of the proceedings regardless of the final outcome of the dispute. *Zvi D.*, 694 F.2d at 906 ("To cut off public funds would amount to a unilateral change in placement, prohibited by the Act.").

The IHO Murphy and 2018 SRO Krolak decisions are owed deference for the same reasons articulated *supra* regarding the IHO Monk and 2017 SRO Krolak decisions. The Court therefore turns to the substance of these decisions, and holds that neither decision erred in upholding the denial of Plaintiffs' request for pendency placement modification. Both decisions are well-supported by a preponderance of the evidence, and both reviewed previous related administrative decisions in this matter and carefully considered Plaintiffs' position before concluding that the parties agreed to and acknowledged the current pendency placement.

Both IHO Murphy and SRO Krolak noted that in prehearing conferences and conference calls, the Parents acknowledged that the parties agreed to A.K.'s current pendency placement. *See* 2018 Krolak Decision at 7. IHO Murphy also noted that previous decisions, such as that of IHO Monk, acknowledge the parties' agreement as to A.K.'s pendency placement. *See* IHO Murphy Order at 10. IHO Murphy concluded that the Parents' request "borders on frivolous," and the Court agrees. *See id.* Further, Plaintiffs' notion that an SRO's agreement with parents that a student's placement is inappropriate acts as a pendency-changing event is misplaced. The issues of pendency and appropriateness are separate analyses, as is made clear by Second Circuit caselaw. As explained above, a pendency placement acts as an injunction, and does not take into account considerations such as appropriateness during the pendency of proceedings. Accordingly, Plaintiffs' motion for summary judgment concerning A.K.'s pendency placement should be denied.

## IV.    CONCLUSION

For the reasons set forth above, the Court respectfully recommends that Plaintiffs' motions for summary judgment, DEs [104] and [105], be denied.

## V.    OBJECTIONS

A copy of this Report and Recommendation is being served on all parties by electronic filing on the date below.    Any objections to this Report and Recommendation must be filed with the Clerk of the Court within 14 days.    Failure to file objections within the specified time waives the right to appeal the District Court's order.    *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 72; *Ferrer v. Woliver*, No. 05-3696, 2008 WL 4951035, at *2 (2d Cir. Nov. 20, 2008); *Beverly v. Walker*, 118 F.3d 900, 902 (2d Cir. 1997); *Savoie v. Merchants Bank*, 84 F.3d 52, 60 (2d Cir. 1996).

Dated:    Central Islip, New York       /s/ Steven I. Locke
         January 6, 2021              STEVEN I. LOCKE
                                      United States Magistrate Judge